[No. S070114. June 17, 1999.]

PETER RAMIREZ, Plaintiff and Appellant, v.
YOSEMITE WATER COMPANY, INC., Defendant and Respondent.

## Counsel

Dennis F. Moss for Plaintiff and Appellant.

Sonnenschein, Nath & Rosenthal, Lee T. Paterson and Weston A. Edwards for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons and Kelly L. Hensley for the Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**MOSK, J.**—Generally, employees in the State of California who work more than 40 hours per week and 8 hours per day (at least, in the latter case, up until January 1, 1998) have had the right to receive premium pay for the hours worked over this limit. (See 1 Wilcox, Cal. Employment Law (rev. Mar. 1998) § 3.04, pp. 3-21 to 3-28.) Labor Code section 1171[1] expressly excludes from the overtime laws employees who are "outside salespersons,"[2] and the California Industrial Welfare Commission (IWC), the agency charged with implementing section 1171, defined the term "outside salesperson" in Wage Order No. 7-80, as someone who "regularly works more than half the working time" engaged in sales activities outside the workplace. (Cal. Code Regs., tit. 8, § 11070, subd. 2(I) (hereinafter Wage Order No. 7-80, 2(I)).)[3] In this case we are called on to decide whether an employee who performs a mixture of sales and nonsales duties is an "outside salesperson" within the meaning of section 1171. The trial court and the Court of Appeal came to the conclusion that the employee, who delivered bottled

---

[1] All statutory citations are to this code unless otherwise specified.

[2] The statute actually uses the term "outside salesman," as does the applicable federal regulation, but the regulation that is the primary focus of this opinion uses the term "outside salesperson." For the sake of consistency, we will use the term "outside salesperson."

[3] Wage Order No. 7-80 was superseded in 1998 by Wage Order No. 7-98, set forth at California Code of Regulations, title 8, section 11070. The present Wage Order does not change Wage Order No. 7-80 in any respect pertinent to the issues discussed herein. The definition of "outside salesperson" is unchanged.

water and was also expected to sell the water service to new customers, was an outside salesperson for purposes of section 1171. Their conclusion was based on a reading of federal regulations that differ substantially from the state regulations applicable in this case: the former regulations define the term by determining the employees' "primary purpose," rather than by calculating how they spend their time.

We conclude these courts may have erred in determining that the employee in this case was an outside salesperson because they incorrectly relied on the federal regulation and interpretation of that regulation when construing this state's distinct definition of "outside salesperson." Accordingly, we reverse the Court of Appeal's judgment and remand for further proceedings.

## I. *Factual and Procedural Background*

Yosemite Water Company, Inc. (Yosemite) is in the business of selling bottled water and other products incidental to the bottled water business, such as cups, coffee, and other ingredients, and of renting water coolers. By 1995, the company had grown from 70 to 150 routes. A route is a defined territory over which a "route sales representative" is responsible for all delivery and sales activity.

Plaintiff Peter Ramirez was employed by Yosemite as a route sales representative between April 1989 and November 1992. From November 1992 to March 3, 1993, when he left the company, Ramirez served as a relief route sales representative.

After he left the company, Ramirez filed a complaint against Yosemite for unpaid overtime wages, unlawful wage deductions and employee charges, and unpaid wages. The company cross-complained against him for damages for interference with contractual relations and interference with prospective economic advantage as the result of his alleged attempt to solicit Yosemite's customers when he left the company. At a subsequent bench trial, much of the evidence presented concerned the matter of how Ramirez spent his average workday. Because the question whether Ramirez was an "outside salesperson," as we will see, turns on a detailed, fact-specific determination of this matter, we shall recount that evidence at some length.

Ramirez spent a substantial portion of his workday delivering bottled water to business and residential customers. Each five-gallon bottle of water Ramirez delivered weighed forty pounds. On an average business stop, Ramirez would deliver six to seven bottles; an average residential customer purchased one to two bottles. About 70 percent of his customers were

residential. When he began on route No. 15, it was an 800-bottle route serving about 400 customers. The route grew so that, at its height, he had 550 customers and averaged 1,500-1,900 bottles delivered in a 10-day cycle, or an average of between 150 and 190 bottles per day. He averaged six delivery stops per hour, delivering one to two bottles on average to residential customers and six to seven bottles for commercial ones. For established customers, he would carry the bottles into a business or place of residence, exchange full for empty bottles, and refill and replace other stock and supplies. He would also rotate bottles on his truck, check the bottles for leaks and foreign objects, and carry the bottles to the customer's house. For some customers, he would also rotate the spare water bottles, wipe off the tops and place the bottles in the coolers. He would also do minor service on the coolers.

According to Ramirez's testimony, he engaged in very little solicitation of regular customers to persuade them to increase their service. He testified that once customers commenced service their purchasing habits became stable, and he generally did not "push" established customers into buying more or different products for fear of offending them. Moreover, he had little direct contact with residential customers, who were frequently not home when he delivered the water. He saw a customer only about 5 to 7 percent of the time, usually at the customer's request. He did not engage in selling to customers he did not see. Customers would communicate by leaving notes or calling, and he would leave bills and reminders of overdue payments under the bottles.

Yosemite employed several full-time employees as solicitors, whose principal task was to sign up new customers. Ramirez was also expected to engage in solicitation of new customers. He testified that he was expected to obtain at least 1 new customer per workday, and to do so, he made on average 10 contacts per day on his route, which took him a total of approximately 30 minutes. He was also generally responsible for "setting up" the new customers. Between once a month and once every two months, he spent six hours on Saturday with other route sales representatives going door-to-door soliciting new customers. He also attended sales meetings designed to improve sales techniques approximately twice a month. In a five-day workweek, he estimated he would spend about three to three and one-half hours trying to sell his service to potential new customers. Occasionally, he would pass out to old and new customers a list of the company's products.

If a potential customer called Yosemite to initiate service, Ramirez would receive a note to call that person back and set up a time to begin service. At

the time he set up a new customer, if he met the customer face-to-face, he would explain the service rules and minimum purchases, and describe the additional products the company had to offer.

From the time Ramirez left the plant around 8 a.m., until he returned in the evening, he testified he worked anywhere from seven to nine hours *not* counting the time he spent soliciting new customers. His average day lasted 11 hours and sometimes longer, such as when he had difficulty balancing his accounts. He worked Monday through Friday, more than 40 hours in a week, in addition to the occasional Saturday noted above. He was not paid for any overtime hours worked.

When he was a route sales representative, Ramirez was paid a minimum of $1,200-$1,400 per month, which Yosemite considered a "guaranteed draw" against future bottle sales. He would also receive an additional 22 percent per bottle and 10 percent for cups, tea, coffee and cooler rentals he delivered once he had exceeded the guaranteed draw. He was paid according to the number of bottles he delivered, whether or not he had originally solicited the customers to whom they were delivered. Thus, if a company solicitor sold water to a new resident located on route No. 15, Ramirez would deliver the water and get the credit for the bottles delivered even though he did not do the soliciting. In addition to his usual compensation, he received a small commission for each new customer he signed: He was paid nothing for the first 10 customers he signed, $5 per new customer for the 11th through 15th customers, $10 per customer for the next 10, and $20 for each new customer over 25.

Maya Soderstrom, Yosemite's president, testified that when a route sales representative made a delivery, he or she was expected to engage in selling activity. As Soderstrom explained, selling "is the main job of our route salespeople," who are in the field selling "constantly." The company's expectation is that the route sales representatives are selling 90 percent or more of their workday, although she later clarified that she was counting the time spent delivering bottles of water to the customer as part of the selling activity. She also explained that the route sales representatives are the primary contact between the company and the customer. Daniel Ledbetter, Ramirez's route supervisor, also testified that over 80 percent of Ramirez's time at work was spent away from the Yosemite plant and over 90 percent of his working day was spent in selling activities, although it is unclear whether or not he had a similarly broad definition as Soderstrom of the term "sales." Ledbetter also confirmed that Ramirez was expected to obtain the equivalent of 1 new customer per day worked and to speak to 10-15 people a day to accomplish this goal.

Claude I. Niesen, special projects manager and a sales training manager at Yosemite, offered an opinion of the time Ramirez took to do various tasks. He purported to base his opinion on his longtime experience in the bottled water industry at Yosemite and other companies, on Ramirez's sales record and deposition, and discussions with Ledbetter and other supervisory personnel at Yosemite. He opined that Ramirez spent 90 percent of his workweek in sales activity and that over 80 percent of his workweek was spent away from the company's premises. Niesen also opined that Ramirez must have spent 850 minutes a week engaged in face-to-face solicitation of prospective customers.

At the conclusion of the trial, the court found in favor of Yosemite that Ramirez was an "outside salesperson." In order to understand the basis of the trial court's decision, it is important to appreciate that there was a fundamental conflict between Ramirez's and Yosemite's interpretations of the meaning of the term "outside salesperson." As noted, IWC provides that an employee be considered an outside salesperson if he or she works more than half the working time away from the employer's place of business selling items or obtaining orders. (Wage Order No. 7-80, 2(I).) Ramirez claimed that the IWC wage order requires the court to tally the amount of time spent engaged in actual sales outside the workplace, as opposed to the time spent delivering products or performing services such as cooler maintenance. He claimed the evidence showed plainly that he spent more time delivering products and providing services than selling, and that therefore he was not an outside salesperson.

Yosemite contended, on the other hand, that the court should look to federal law. When a sales/delivery person is performing a dual function, the court must ascertain "the primary function" of the employee as determined by various factors discussed below. Yosemite argued that Ramirez's primary function was sales and therefore he was an outside salesperson. Yosemite also argued that inasmuch as Wage Order No. 7-80, 2(I) could be construed to conflict with federal law, the IWC must have exceeded its authority, because Labor Code section 1171 intended to fully incorporate the federal definition of outside salesperson. The trial court appeared to agree with Yosemite both that the "primary function" analysis was applicable and that Ramirez was an outside salesperson.

The trial court also found that Ramirez was exempt from the overtime laws under another section of Wage Order No. 7-80 because he earned over 50 percent of his salary from commissions. (See Wage Order No. 7-80, subd. 3(c); see now Wage Order No. 7-98, set out at Cal. Code Regs., tit. 8, § 11070, subd. 3(B).)

The Court of Appeal affirmed, also accepting the federal "primary function" analysis. Although it acknowledged that the language of the IWC regulation defining outside salesperson differed from federal regulations, it nonetheless looked to the federal regulations "for guidance." After reviewing the pertinent federal regulations, which will be discussed more fully below, the court concluded that Ramirez's "prime function" was selling bottles of water and additional products, and that he therefore fit within the definition of "outside salesperson." It did not reach the question whether Ramirez was also exempt from the overtime laws as a commissioned employee.

We granted review to determine the proper meaning of the term "outside salesperson."

## II. Discussion

### A. Standard of Review

The question whether Ramirez was an outside salesperson within the meaning of applicable statutes and regulations is, like other questions involving the application of legal categories, a mixed question of law and fact. (See, e.g., *Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) ■ In the present case, although there was some controversy as to the facts—i.e., as to what Ramirez did as an employee for Yosemite—the predominant controversy is the precise meaning of the term "outside salesperson," a question of law. It was this question on which we granted review. As such, we will review the Court of Appeal's and the trial court's judgment independently on the question of this term's meaning in this context. (*Ibid.*)

### B. The Outside Salesperson Exemption

■ In interpreting the scope of an exemption from the state's overtime laws, we begin by reviewing certain basic principles. First, "past decisions . . . teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection." (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579].) Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed. (*Nordquist* v. *McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221]; see also *Phillips Co.* v. *Walling* (1945) 324 U.S. 490, 493 [65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876].) Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the

employee's exemption. (*Nordquist, supra,* 32 Cal.App.4th at p. 562; *Corning Glass Works* v. *Brennan* (1974) 417 U.S. 188, 196-197 [94 S.Ct. 2223, 2229, 41 L.Ed.2d 1].)

The IWC is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in the State of California. (*Tidewater Marine Western, Inc.* v. *Bradshaw* (1996) 14 Cal.4th 557, 561 [59 Cal.Rptr.2d 186, 927 P.2d 296].) The IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act (FLSA) and accompanying federal regulations. (See, e.g., *Tidewater, supra,* 14 Cal.4th at pp. 566-567 [seamen entitled to overtime under wage order despite exemption from FLSA]; *Aguilar* v. *Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 33-34 [285 Cal.Rptr. 515] [employees working shifts of less than 24 hours entitled to be paid for sleep time, notwithstanding contrary federal rule]; *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 247 [211 Cal.Rptr. 792], disapproved on other grounds in *Tidewater, supra,* 14 Cal.4th at p. 574 [regular rate of pay for overtime purposes calculated by dividing salary by no more than 40 hours, notwithstanding federal rule authorizing use of fluctuating workweek].) The FLSA explicitly permits greater employee protection under state law. "The FLSA includes a 'savings clause,' which provides: 'No provision of this chapter or of any order thereunder shall excuse noncompliance with any . . . State law or municipal ordinance establishing . . . a maximum workweek lower than the maximum workweek established [hereunder] . . . .' (29 U.S.C. § 218(a).) The federal courts that have addressed this question have interpreted this savings clause as expressly permitting states to regulate overtime wages. (See, e.g., . . . *Pacific Merchant Shipping Ass'n* v. *Aubry* [(1990)] 918 F.2d [1409,] 1422 ['Congress has specifically allowed states to enforce overtime laws more generous than the FLSA,' citing the savings clause] . . . .)." (*Tidewater, supra,* 14 Cal.4th at p. 567.)

At issue in this case is an interpretation of section 1171 and Wage Order No. 7-80, 2(I). Section 1171, found in the chapter of the Labor Code pertaining to minimum wage, maximum hour, and overtime laws, states: "The provisions of this chapter shall apply to and include men, women and minors employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but *shall not include any individual employed as an outside salesman.*" (Italics added.) Wage Order No. 7-80, 2(I), implementing section 1171, in turn defined "outside salesperson" as follows: "[A]ny person, 18 years of age or over, who customarily and regularly works *more than half the working time* away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." (Italics added.)

The Court of Appeal, finding no case law or other elucidation of this part of the IWC wage order, turned, as noted, to federal regulations. These regulations explicate the meaning of the term "outside salesperson" in those employment situations in which the employee performs a mixture of delivery and sales work. The Court of Appeal purported to "synthesiz[e] the guidelines in federal regulations together with [Wage] Order No. 7-80" to arrive at the proper ruling in this case.

Those federal regulations to which the Court of Appeal looked for guidance differ substantially from the wage order. Section 541.5 of title 29 of the Code of Federal Regulations (1998) defines the term "outside salesman" as an "employee: [¶] (a) [w]ho is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in: [¶] (1) [m]aking sales within the meaning of section 3(k) of the Act; or [¶] (2) [o]btaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and [¶] (b) [w]hose hours of work of a nature other than that described in paragraph (a) (1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided,* [t]hat work performed *incidental to and in conjunction* with the employee's own outside sales or solicitations, *including incidental deliveries and collections,* shall not be regarded as nonexempt work." (First italics in original, other italics added.)

The operative effect of the federal exemption is concisely summarized at section 541.505(a) of title 29 of the Code of Federal Regulations (1998): "[I]n the case of outside salesmen . . . , the employee's chief duty or *primary function* must be the making of sales or the taking of orders if he is to qualify under the definition in § 541.5. He must be a sales[person] by occupation. If he is, all work that he performs which is actually incidental to and in conjunction with his own sales effort is exempt work. All other work of such an employee is nonexempt work. . . . All of the duties performed by an employee must be considered. The time devoted to the various duties is an important, but not necessarily controlling, element." (Italics added.) In determining whether an employee's "primary function" is as a salesperson, such factors to be considered are the "presence or absence of customary or contractual prearrangements concerning amounts of products to be delivered; description of the employee's occupation in union contracts; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; proportion of earnings directly attributable to sales effort; and other factors that may have a bearing on the relationship to sales of the employee's work." (29 C.F.R. § 541.505(e) (1998).)

Furthermore, 29 Code of Federal Regulations section 541.505(b) (1998), which appears to have the most direct bearing on the present case, states: "[T]here is little question that a routeman who provides the only sales contact between the employer and the customers, who calls on customers and takes orders for products which he delivers from stock in his vehicle or procures and delivers to the customer on a later trip, and who receives compensation commensurate with a volume of products sold, is employed for the purpose of making sales."

Thus, the federal exemption focuses on defining the employee's "primary function," not on how much work time is spent selling. Although the federal exemption does place a 20 percent cap on nonexempt (i.e., nonsales) work, that cap does not apply to any nonsales activities that are "incidental" to outside sales, including the making of deliveries. In other words, so long as it can be shown that the individual's chief duty or primary function is making sales, then every activity in any way incidental to sales may be funneled into the exempt category and excluded from the 20 percent cap on nonexempt work.

Wage Order No. 7-80, on the other hand, makes no mention of the primary function for which the person is employed. Rather, the state regulation takes a purely quantitative approach, focusing exclusively on whether the individual "works more than half the working time . . . selling . . . or obtaining orders or contracts." (Wage Order No. 7-80, 2(I).) State law also differs from the federal regulation in that it does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is *incidental to* sales. The language of the state exemption only encompasses work directly involved in "selling . . . items or obtaining orders or contracts." (*Ibid.*)

By choosing not to track the language of the federal exemption and instead adopting its own distinct definition of "outside salespersons," the IWC evidently intended to depart from federal law and to provide, at least in some cases, greater protection for employees. Under the Court of Appeal's interpretation, on the other hand, a California employee is accorded significantly *less*, not more, protection than under the federal standard. This is so because the Court of Appeal imported the laxer federal criteria regarding what constitutes an exemption into a state standard that requires only more than 50 percent in exempt activities in order to qualify as an outside salesperson, as opposed to 80 percent under federal law. The Court of Appeal failed to recognize that the two numbers referred to two different types of classifications, with the former number measuring activities directly related to sales, and the latter, larger number measuring both those activities

and activities "incidental to" sales, as that term has come to be broadly defined under federal regulations. (See 29 C.F.R. § 541.505(b), (e) (1998).) In confounding federal and state labor law, and thereby providing less protection to state employees, the Court of Appeal and the trial court departed from the teaching that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced. (See *Aguilar* v. *Association for Retarded Citizens, supra*, 234 Cal.App.4th 21, 34-35; *Skyline Homes, Inc.* v. *Department of Industrial Relations, supra*, 165 Cal.App.3d at pp. 247-249.)[4]

In sum, Wage Order No 7-80, 2(I) incorporates a quantitative method for determining whether an employee is an outside salesperson that differs in some respect from the qualitative method employed under federal law. The Court of Appeal and the trial court employed the federal method, or an improper hybrid of the state and federal methods, not fully acknowledging the differences between the two schemes and the consequently problematic nature of using interpretations of the federal regulation as a key to understanding the state regulation. These courts therefore erred in that respect.

Yosemite argues the IWC exceeded its regulatory authority in adopting a definition of "outside salesperson" at variance with the federal definition. Yosemite points to the fact that at the time the outside salesperson exemption contained in section 1171 was adopted in 1972 (Stats. 1972, ch. 1122, § 2, p. 2153), the FLSA had already adopted the definition of that term and accompanying regulations reviewed above. Because the term "outside salesperson" was used nowhere else in California law, Yosemite argues that it is logical to infer that the Legislature intended to fully incorporate the federal definition. Yosemite therefore concludes that the IWC exceeded its legislative mandate by adopting a regulation that is narrower than the federal one.

■ In assessing Yosemite's claim, we first consider the general framework of judicial review of administrative regulations. In *Yamaha Corp. of America* v. *State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1,

---

[4]The IWC's distinct approach to defining categorical overtime exemptions can also be illustrated in its treatment of the exemption for administrative, executive, and professional employees. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A).) The federal exemption for this category of employees adopts a core test which focuses on the employee's "primary duty"; if the "primary duty" test is met, then he or she is deemed exempt regardless of how much time the individual actually spends performing the primary duty. (29 C.F.R. §§ 541.1(f), 541.2(e)(2), and 541.3(e) (1998).) By contrast, the state law exemption, as in the case of "outside salespersons," adopts the requirement that the employee must be "engaged . . . primarily" in exempt work (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)); the term "primarily" is defined as "more than one-half the employee's work time." (*Id.*, § 11070, subd. 2(J).)

960 P.2d 1031] (*Yamaha*), we posited a dichotomy between "quasi-legislative" and "interpretive" rules. Quasi-legislative regulations are those "adopted by an agency to which the Legislature has confided the power to 'make law'" (*id.* at p. 7), and such rules "have the dignity of statutes" (*id.* at p. 10). On the other hand, interpretive regulations are those which involve "*an agency's interpretation of a statute or regulation* . . ." (*id.* at p. 7, italics omitted), and are given variable deference according to a number of factors (*id.* at p. 12). As we acknowledged, "administrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature." (*Id.* at p. 6, fn. 3.)

Regulations that fall somewhere in the continuum may have both quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms. In *Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999 [9 Cal.Rptr.2d 358, 831 P.2d 798] (*Moore*), for example, we reviewed a regulation by the Board of Accountancy, the agency statutorily chartered to regulate the accounting profession in this state, providing that those unlicensed by that board could not use the title "accountant." The agency was interpreting a statute, Business and Professions Code section 5058, that forbids use of titles " 'likely to be confused with' " the titles of " ' "certified public accountant" ' " and " ' "public accountant." ' " (2 Cal.4th at p. 1011.) As we stated: "Inasmuch as enforcement of the provisions of the Accountancy Act, including section 5058, is entrusted to the *Board*, it seems apparent that the Legislature delegated to the Board the authority to determine whether a title or designation not identified in the statute is likely to confuse or mislead the public. Since the Board was also authorized to seek an injunction against the use of such terms, its authority to 'adopt, repeal, or amend such regulations as may be reasonably necessary and expedient for the . . . administration of [the Accountancy Act]' (§ 5010) includes the power to identify by regulation those terms which it finds are 'likely to be confused with "certified public accountant" or "public accountant," ' the use of which may be enjoined under the broad prohibition of section 5058. To conclude otherwise would contravene the intent and purpose behind the statute." (2 Cal.4th at pp. 1013-1014, italics added; see also *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328] [administrative agency with rulemaking power is authorized to "fill up the details" of a statutory scheme].)

The regulation at issue in the present case, as in *Moore*, has both quasi-legislative and interpretive characteristics. The Legislature has expressly delegated to the IWC the authority to promulgate wage orders setting

"minimum wages, maximum hours and standard conditions of labor for all employees." (§ 1185.) "Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion. [Citations.] [¶] Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed." (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 702.) As in *Moore,* this delegation of legislative authority includes the power to elaborate the meaning of key statutory terms. On the other hand, since the IWC is engaged in construing the meaning of a portion of section 1171, its regulation is in some sense interpretive.

If Wage Order No. 7-80, 2(I) is considered quasi-legislative regulation, it is certainly valid. ■ " ' "[I]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is 'within the scope of the authority conferred' [citation] and (2) is 'reasonably necessary to effectuate the purpose of the statute' [citation]." ' " (*Yamaha, supra,* 19 Cal.4th at p. 11.)

■ We conclude, first of all, that Wage Order No. 7-80, 2(I) is within the scope of the IWC's authority. Although the Legislature in 1972 adopted the outside salesperson exemption already found in federal law, nothing in either the language or the legislative history of the statute suggests that the Legislature thereby intended to incorporate, down to the last detail, all the federal regulations pertaining to that exemption. The only mention of the outside salesperson exemption we can uncover is a sentence in a Senate committee analysis noting that "opposition has also been expressed by the Vacuum Cleaner Manufacturers Association, who wish to examine the impact of outdoor salesman who work on a commission." (Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 30 (1971 Reg. Sess.) as amended Apr. 1, 1971, p. 1.) The next time the bill was amended, the outside salesperson. exemption in its present form appeared for the first time. (Sen. Amend. to Assem. Bill No. 30 (1971 Reg. Sess.) July 27, 1971.) In the absence of statutory language or legislative history to the contrary, we have no reason to presume that the Legislature, in delegating broad regulatory authority to the IWC, obliged the agency to follow in each particular a federal regulatory agency's interpretation of a common term. And indeed, as cited above, and as the Legislature was presumably aware, there are numerous instances in which the IWC has chosen different methods of implementing laws pertaining to wages and hours. We therefore conclude that the IWC,

in formulating a definition of "outside salesperson" that diverged from the federal definition, did not thereby exceed its statutory authority.

We also conclude that Wage Order No. 7-80, 2(I), was reasonably necessary to effectuate the purpose of section 1171. It was necessary for the IWC to establish some working definition of "outside salesperson" that takes into account the fact that some employees work in both sales and nonsales capacities. It was reasonable for the IWC, in formulating its definition, to take a quantitative approach, looking to the actual hours spent on sales activity to determine if an employee is primarily a salesperson. Thus, we conclude that adoption of the IWC's definition of outside salesperson was not arbitrary or capricious, nor did it exceed the scope of the IWC's statutory mandate.

On the other hand, even if we considered Wage Order No. 7-80, 2(I) a purely interpretive regulation, it has two attributes which weigh in favor of considerable judicial deference to the agency's interpretation. First, the interpretation is contained in a regulation formally adopted pursuant to the Administrative Procedure Act. ▉ " '[A]n interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member.' " (*Yamaha, supra,* 19 Cal.4th at p. 13.) ▉ Second, the regulation is entitled to greater deference because it embodies a statutory interpretation that the administrative agency " 'has consistently maintained' " and " 'is [of] long-standing' " (*ibid.*), i.e., for almost 20 years. For these reasons, the IWC's definition is entitled to deference regardless of whether it is deemed a quasi-legislative or interpretive regulation. We conclude that the IWC's interpretation of the term "outside salesperson" is reasonable and should not be invalidated.

Yosemite contends that the pertinent language of Wage Order No. 7-80, 2(I), strictly construed, will lead to an absurd result inasmuch as even those employed full time as salespeople often do not spend more than half of their time directly selling to customers, but engage in other related activities such as preparation, travel time, and paperwork. There is, however, no need to interpret the wage order so strictly. If a salesperson must travel one hour to destination A in order to attempt a sale, then surely the most reasonable interpretation of the wage order is to count the hour of travel time as time spent "selling." But if, as in the present case, an employee travels to a destination to engage in both sales and nonsales activities, the travel time must be apportioned among the two types of activities for purposes of determining the total amount of time spent doing sales and nonsales work.

▉ Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties that caused some confusion in

the trial court and the Court of Appeal: Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

In the present case, the evidence is uncontroverted that Ramirez performed both sales and delivery functions for Yosemite. Delivery of preordered water bottles or the restocking of "empties" is not a sales activity in the conventional meaning of the word—one who *only* performed these delivery tasks could not be considered a salesperson. It is true, as Yosemite points out, that failure to properly deliver the product would lead to loss of the customer, but that does not make such delivery a sales activity, any more than an attorney's preparation of a legal brief in order to satisfy and thereby retain a client is a sales activity.

Although appellate courts normally defer to trial courts' resolution of conflicting evidence when there is substantial evidence to support the trial court's decision (see *Gray* v. *Don Miller & Associates Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]), in the present case the record indicates that the trial court's review of the evidence of whether Ramirez was an outside salesperson was tainted by an interpretation of the term that was overly favorable to finding the exemption. In other words, the record suggests that the trial court would have found Ramirez to be an outside salesperson even if it believed all of Ramirez's testimony as to how he spent his time on the job to be true, whereas a plain

reading of that testimony in light of Wage Order No. 7-80, 2(I) would yield the contrary conclusion. Thus, it is unclear from the record that the court ever saw the need to resolve inconsistent testimony presented at trial. (See *Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972-973 [64 Cal.Rptr.2d 843, 938 P.2d 903] [when trial court applies incorrect standard that keeps it from resolving factual disputes, remand for further factfinding appropriate]; see also *Webster* v. *Trustees of Cal. State University* (1993) 19 Cal.App.4th 1456, 1462-1463 [24 Cal.Rptr.2d 150] [when trial court in administrative writ proceedings employs substantial evidence standard that makes resolution of conflicting evidence unnecessary, instead of the correct independent judgment test, remand is appropriate].) We therefore conclude that remand to the trial court is the most appropriate disposition. On remand the trial court may have to resolve significant factual discrepancies—for example, Ramirez's claim that he spent only 150 minutes a week on direct door-to-door sales versus Yosemite's claim that he spent 850 minutes a week.[5]

### C. *Ramirez as a Commissioned Employee*

Wage Order No. 7-80, subdivision 3(e) and its successor, Wage Order No. 7-98, subdivision 3(B), state that "[p]rovisions of [overtime compensation] shall not apply to any employee whose earnings exceed one and one-half (1½) times the minimum wage, if more than half (½) of that employee's compensation represents commissions." As discussed above, the trial court found not only that Ramirez was an outside salesperson but also that he was compensated primarily through commissions within the meaning of this wage order. Therefore, for that independent reason, the court found he should be exempt from the overtime statute. There would be no need to remand this case if we agreed with the trial court that Ramirez was a commissioned employee.

The IWC wage order does not define the term "commission," but its meaning is set forth in Labor Code section 204.1 as follows: "Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Although section 204.1 applies specifically to employees of vehicle dealers, both parties contend, and we agree, that the statute's definition of "commission" is more generally applicable. In interpreting this language, the Court of Appeal in *Keyes Motors, Inc.* v. *Division*

---

[5]On remand, the trial court should, as Ramirez requested, itemize the types of activities that it considers to be sales related, and the approximate average times that it finds the employee spent on each of these activities. Because the question whether a particular activity is sales related is a mixed one of law and fact, this itemization will enable an appellate court to review whether the trial court's legal classifications are correct, and whether its factual findings are supported by substantial evidence.

*of Labor Standards Enforcement* (1987) 197 Cal.App.3d 557, 563 [242 Cal.Rptr. 873] stated: "We conclude Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute 'commission wages.' First, the employees must be involved principally in selling a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service." (Italics omitted.)

Ramirez was compensated at a flat rate of $1,200-$1,400 per month, plus a percentage of the price of the bottles of water and related products sold when sales exceeded the flat rate. The parties dispute whether or not the $1,200-$1,400 sum represented a "draw" against future bottle sales, or was more in the nature of a salary. But regardless of which it was, and regardless of whether Ramirez's compensation could be characterized as "a percentage of the price of the product or service," it is not at all clear that the first condition set forth by the *Keyes* court was met. As discussed above, it remains to be clarified on remand whether Ramirez was "involved principally in selling the product or service." Because our determination of whether Ramirez was a commissioned employee depends partly on matters to be decided by the trial court on remand, we believe this question is also best resolved on remand.

## III. *Disposition*

For all of the foregoing reasons, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.