LIU, J.,
Concurring. — It is not difficult to understand why the trial court’s sampling plan in this case was “profoundly flawed.” (Maj. opn., ante, at p. 13.) The representative witness group was not selected at random but in a manner biased in plaintiffs’ favor. The trial court used no known statistical rationale in picking a sample size of 20, and there is no reason to think the sample was sufficiently large. The trial court also tolerated a margin of error at the damages phase that was undoubtedly too large. These errors require reversal of both the liability phase and restitution phase judgments.
At the same time, today’s opinion takes an appropriately cautious approach to guiding the conduct of class action trials in employee misclassification cases and, in particular, the use of statistical methods in such trials. The court disavows any “sweeping conclusion as to whether or when sampling should be available as a tool for proving liability in a class action,” while emphasizing that any trial plan involving statistical methods “must allow the defendant to litigate its affirmative defenses.” (Maj. opn., ante, at p. 40; see id. at p. 35 [“While representative testimony and sampling may sometimes be appropriate tools for managing individual issues in a class action, these statistical *51 methods cannot so completely undermine a defendant’s right to present relevant evidence.”].) The court warns that “decisions about the fact of liability” should not be “reframed as questions about the extent of liability,” and then adds that “[t]his is not to say that an employer’s liability for misclassification may never be decided on a classwide basis.” (Id. at p. 37.)
Consistent with our settled precedent, today’s opinion continues to encourage trial courts to be “ ‘procedurally innovative’ ” in managing class actions and leaves open “the appropriate use of representative testimony, sampling, or other procedures employing statistical methodology.” (Maj. opn., ante, at p. 33; see Sav-On Drug Stores, Inc. v. Superior Court (2004) 34 Cal.4th 319, 339-340 [17 Cal.Rptr.3d 906, 96 P.3d 194] (Say-On)-, City of San Jose v. Superior Court (1974) 12 Cal.3d 447, 453 [115 Cal.Rptr. 797, 525 P.2d 701].) Here I offer a few comments to further elucidate the proper inquiry at the class certification stage of an employee misclassification case and the duty of trial courts to manage individual issues in a class action trial.
I.
The threshold task for determining whether a class action is appropriate in a particular case is to inquire whether the substantive law governing the plaintiffs’ claims renders those claims amenable to class treatment. Because disputes over the facts or methods of proof that bear on class certification are often, in reality, disputes over “the substantive law that governs the litigation,” it is important that courts employ a proper understanding of the substantive governing law to inform the class certification decision, and not the other way around. (Nagareda, Class Certification in the Age of Aggregate Proof (2009) 84 N.Y.U. L.Rev. 97, 104; see id. at pp. 105-106 [“This is not to suggest that class actions- — any more or less than conventional, individual lawsuits — cannot serve as vehicles for change in legal doctrine. It is simply to say that the proposed class-wide nature of the litigation should exert no independent weight in arguments for such change.” (fn. omitted)].) The exposition of substantive law should be independent of the fact that “the case at hand happens to take a proposed aggregate form.” (Id. at p. 108.)
The question in this case is whether the employees in the proposed class are “outside salespersons” exempt from the state’s overtime laws. An “ ‘[o]utside salesperson’ ” is one “who customarily and regularly works more than half the working time away from the employer’s place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.” (Industrial Welfare Com., wage order No. 4-2001, subd. 2(M) (Wage Order No. 4-2001, subd. 2(M)); Cal. Code Regs., tit. 8, § 11040, subd. 1(C).) We set forth an authoritative construction *52 of the term in Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th 785 [85 Cal.Rptr.2d 844, 978 P.2d 2] (Ramirez), a case having nothing to do with class actions. The central dispute in Ramirez was whether the outside salesperson exemption should be construed in the same manner as an analogous federal exemption, which “focuses on defining the employee’s ‘primary function,’ not on how much work time is spent selling.” (Id. at p. 797.) Rejecting that view, we concluded that the relevant wage order “incorporates a quantitative method for determining whether an employee is an outside salesperson that differs in some respect from the qualitative method employed under federal law.” (Id. at p. 798.)
In elaborating upon “California’s distinctive quantitative approach to determining which employees are outside salespersons,” Ramirez resolved a question that had confused litigants and lower courts: “Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee should be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the [Industrial Welfare Commission’s] quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer’s job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the realistic requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee’s practice diverges from the employer’s realistic expectations, whether there was any concrete expression of employer displeasure over an employee’s substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.” (Ramirez, supra, 20 Cal.4th at pp. 801-802.)
Thus, in recognizing that California’s definition of an outside salesperson is quantitative in nature, Ramirez did not say that the test boils down to whether a particular employee actually spends more than 50 percent of his or her working hours on outside sales. Instead, the ultimate question is: what are “the realistic requirements of the job”? (Ramirez, supra, 20 Cal.4th at p. 802.) The primary consideration that informs this inquiry is “how the employee actually spends his or her time.” (Ibid.) But, as Ramirez made clear, this factor is not dispositive because an employee who falls below the 50 *53 percent threshold “should not thereby be able to evade a valid exemption” if the employee “is supposed to be engaged in sales activities during most of his working hours.” (Ibid.) By the same logic, an employee who exceeds the 50 percent threshold should not be classified as exempt if devoting that much time to outside sales is not a realistic requirement of the job. Ramirez’s focus on “the realistic requirements of the job” parallels the wage order’s definition of an outside salesperson as one who not only “regularly” but also “customarily” spends more than half the working time on outside sales activity. (Wage Order No. 4-2001, subd. 2(M), italics added.) How an employee actually spends his or her time is certainly probative of what is customary or realistically required in the performance of a particular job. But so are “whether the employee’s practice diverges from the employer’s realistic expectations, whether there was any concrete expression of employer displeasure over an employee’s substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.” (Ramirez, at p. 802.)
Once we have brought into focus the ultimate issue of “the employer’s realistic expectations” or “the realistic requirements of the job” (Ramirez, supra, 20 Cal.4th at p. 802), it is not difficult to contemplate that employees in a given job classification will often be either wholly exempt or wholly nonexempt, since a job classification often entails a common set of employer expectations or requirements for performance of the job. That is not to say that trial courts should simply rely on “an employer’s job description” in deciding whether employees are outside salespersons; as Ramirez warned, “the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality.” (Ibid.) How employees actually spend their time obviously matters. But Ramirez also warned that it “would [not] be wholly satisfactory” to rely solely on “the actual average hours the employee spent on sales activity.” (Ibid.) Variability in such hours does not necessarily prove that the employer’s realistic expectations or the realistic requirements of the job were not the same for all employees in a given job classification.
We addressed the implications of Ramirez for class actions in Sav-On, supra, 34 Cal.4th 319, which upheld certification of a class of drug store employees who alleged they had been misclassified as managers exempt from overtime laws. The defendant in Sav-On argued that the managerial exemption, like the outside salesperson exemption in Ramirez, turns on “ ‘the actual tasks performed by each class member, the amount of time each class member spent on those tasks, and how the class member’s practices compare to the employer’s reasonable expectations,’ ” and that such individualized factors necessarily bar class certification. (Id. at p. 335.) We rejected this argument: “Presence in a particular overtime class action of the considerations reviewed in Ramirez does not necessarily preclude class certification. *54 Any dispute over ‘how the employee actually spends his or her time’ (Ramirez, supra, 20 Cal.4th at p. 802), of course, has the potential to generate individual issues. But considerations such as ‘the employer’s realistic expectations’ (ibid.) and ‘the actual overall requirements of the job’ (ibid.) are likely to prove susceptible of common proof. Defendant’s ‘realistic expectations,’ in particular, may become relevant in this case, and a reasonable court could conclude these are susceptible of common proof.” (Sav-On, at pp. 336-337; see maj. opn., ante, at p. 27 [“Job requirements and employer expectations of how duties are to be performed may often be established by evidence relating to a group as a whole.”].) In the present case, defense witnesses testified that all business banking officers (BBOs) were expected to spend the majority of their time on outside sales activity. (Id. at p. 19.)
Sav-On went on to say that “our observation in Ramirez that whether the employee is an outside salesperson depends ‘first and foremost, [on] how the employee actually spends his or her time’ (Ramirez, supra, [20 Cal.4th] at p. 802) did not create or imply a requirement that courts assess an employer’s affirmative exemption defense against every class member’s claim before certifying an overtime class action.” (Sav-On, supra, 34 Cal.4th at p. 337.) Such an approach, we said, would “require as a prerequisite to certification that plaintiffs demonstrate defendant’s classification policy was . . . either ‘right as to all members of the class or wrong as to all members of the class,’ ” thereby reversing the employer’s burden to prove the employee’s exemption. (Id. at p. 338.) “Ramirez is no authority for such a requirement, nor does the logic of predominance require it.” (Ibid.)
Since Sav-On, a number of Courts of Appeal have upheld denials of class certification in employee misclassification cases based on the conclusion they were not amenable to common proof. In some cases, preliminary evidence revealed that a common job classification and description did not actually reflect common employer expectations or requirements. (See, e.g., Arenas v. El Torito Restaurants, Inc. (2010) 183 Cal.App.4th 723, 734 [108 Cal.Rptr.3d 15] [affirming denial of class certification where trial court credited defense evidence that duties of a restaurant manager varied significantly from restaurant to restaurant].) But Sav-On made clear that variation in how employees spend their time does not, by itself, preclude a finding that an employer’s realistic expectations are susceptible to common proof. Here, under the relevant wage order, the ultimate question is whether BBOs “customarily and regularly” spend more than half their working time on exempt tasks. (Wage Order No. 4-2001, subd. 2(M), italics added.)
II.
As today’s opinion explains, the predominance of common issues “is not the only consideration. In certifying a class action, the court must also *55 conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently.” (Maj. opn., ante, at pp. 28-29; see Brinker Restaurant Corp. v. Superior Court (2012) 53 Cal.4th 1004, 1054 [139 Cal.Rptr.3d 315, 273 P.3d 513] (cone. opn. of Werdegar, J.) (Brinker) [“whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues”].)
A principal error in this case was the trial court’s refusal to consider declarations from class members outside of the representative witness group during the trial. I agree that “[i]n rigidly adhering to its flawed trial plan and excluding relevant evidence central to the defense, the court here did not manage individual issues. It ignored them.” (Maj. opn., ante, at p. 34.) What would it mean to “manage individual issues” in the context of an employee misclassification case? To aid the trial court on remand, as well as future courts in similar cases, I briefly address this question.
At the outset, it must be remembered that a declaration indicating that an employee typically spent more than 50 percent of the workday engaged in outside sales activity does not dispositively show that the employee was properly classified as exempt. Rather, such a declaration is evidence bearing on the ultimate issue of “the employer’s realistic expectations” or “the realistic requirements of the job.” (Ramirez, supra, 20 Cal.4th at p. 802.) In a trial, such evidence must be assessed for its weight and credibility, and it must be considered together with all other evidence bearing on the ultimate issue.
Further, although a representative sampling approach to proving class liability is not appropriate for all statutory rights (see Wal-Mart Stores, Inc. v. Dukes (2011) 564 U.S._[180 L.Ed.2d 374, 131 S.Ct. 2541]), the need to manage individual issues does not foreclose the use of sampling, representative testimony, or other statistical methods to obtain relevant evidence in a class action trial on employee misclassification. However, because such methods are inherently designed to reveal generalized characteristics of a population, they pose the risk that a defendant’s affirmative defenses as to individual employees will not be properly adjudicated. There are two ways that a trial court should consider individual issues in this context.
First, consideration of individual issues should inform the design of any sampling or similar statistical approach. As today’s opinion notes, “[i]t is impossible to determine an appropriate sample size without first learning about the variability in the population.” (Maj. opn., ante, at p. 42.) In other words, a valid sampling plan must take into account individual variation within the population, and in that sense, consideration of individual issues is *56 “baked into” the plan’s design. Litigation over the degree or nature of variability in the population may result in a determination that no valid sampling plan would be practical or efficient, that multiple samples must be used in order to capture heterogeneity within the class, or that a sampling plan is viable only for a certain subset of the class.
Second, even when a trial court has settled on a valid sampling plan, the defendant is entitled to raise individual issues that challenge the results of the plan as implemented. The defendant may introduce evidence, such as individual declarations, suggesting that the sample was not truly representative or that the margin of error admits substantial variation around an average or generalized finding. Faced with evidence from individual and aggregate methods of proof, the trial court must reasonably resolve any conflicts. In so doing, the court may arrive at many possible conclusions, depending on the evidence.
As noted, the court must assess the credibility of the individualized evidence. Here, for example, the credibility of declarations as to how much time an employee spent on outside sales activity may depend on whether the employer or employee kept contemporaneous records of his or her time. Or the trial court could call some of the declarants to testify and assess whether their testimony confirmed or contradicted their declarations. The court might find that the individualized evidence lacks credibility and that the sampling evidence is reliably probative of the employer’s realistic expectations. Or the court might find that the individualized evidence is credible and casts doubt on the validity of the sampling plan as executed. In the latter case, the court might conclude that variability cannot be managed in a class proceeding and that the class should be decertified. Or the court might notice patterns that suggest unmanageable variation in particular subgroups, resulting in partial decertification. Or the court might conclude that the individualized evidence shows only a few outliers that can be handled through minitrials without disrupting the class proceeding.
Alternatively, the court might find that the individualized evidence, while credible, does not show variability in the class but rather provides strong, consistent evidence of the employer’s realistic expectations for the job at issue. Such evidence, depending on what it showed, could support a finding of exemption or nonexemption for the entire class, thereby corroborating or undercutting the sampling evidence. Or such evidence could support a finding of liability for a subset of the class, while tending to disprove liability for the remainder.
The important point is that neither an aggregate method of proof (like sampling or representative witness testimony) nor individualized evidence *57 (like a declaration) is necessarily dispositive when the ultimate issue at trial is to determine “the employer’s realistic expectations” or “the realistic requirements of the job.” (Ramirez, supra, 20 Cal.4th at p. 802.) The two types of evidence must be considered and weighed alongside each other, and more broadly, they must be considered and weighed together with the full range of evidence bearing on the ultimate issue, including the employer’s job description, company policies, industry customs, and testimony of supervisors or managers who monitored, evaluated, or otherwise set expectations for employees in the class. We entrust our trial courts with the task of weighing such multidimensional evidence, and their judgments will be sustained if supported by substantial evidence. (Cf. Brinker, supra, 53 Cal.4th at p. 1017 [class certification upheld when supported by substantial evidence of employer’s uniform unlawful policy].)
A class action trial plan, however well conceived, cannot anticipate every possible development. The trial court must address individual issues when they arise. In so doing, the court has a great deal of discretion — from determining the weight to be given to individualized and aggregate evidence, to determining how much variability such evidence suggests there is in the class, to determining what implications such evidence has for continued certification of the class and for the ultimate merits of the case. As we said in Sav-On: “Courts seeking to preserve efficiency and other benefits of class actions routinely fashion methods to manage individual questions. For decades ‘[t]his court has urged trial courts to be procedurally innovative’ [citation] in managing class actions, and ‘the trial court has an obligation to consider the use of . . . innovate procedural tools proposed by a party to certify a manageable class’ [citations]. Such devices permit defendants to ‘present their opposition, and to raise certain affirmative defenses.’ [Citation.]” (Sav-On, supra, 34 Cal.4th at pp. 339-340, fns. omitted; see id. at p. 339, fns. 11-12 [providing numerous examples of methods to manage individual issues, including bifurcation, subclasses, questionnaires, and individualized hearings].)
III.
Today’s opinion properly identifies the shortcomings of the representative witness group in this case and the trial court’s failure to give due consideration to the individualized evidence that U.S. Bank National Association (USB) sought to introduce in its defense. But it is important to note that the trial court focused on the right question on the merits: What were the realistic requirements of the BBO position?
At trial, no party argued that USB lacked common expectations and requirements for BBOs. According to USB’s answer brief, USB presented *58 evidence, including testimony of BBO supervisors, that it “expects BBOs to spend 80 per cent of their time on these ‘outside sales activities.’ ” Plaintiffs, on the other hand, presented evidence that the BBO position required employees to spend most of their time on telemarketing and other in-office tasks. The trial court, after hearing the evidence, made detailed findings in support of its conclusion that “it is not realistic for BBOs to spend more than half of their work time outside of bank locations because the credit or loan transaction cannot be consummated, nor the sales goal met, without substantial effort that does not or cannot be performed outside of bank locations.”
Such findings, if based on substantial evidence, ordinarily would be sufficient to show the nonexempt status of employees under the relevant wage order. In this case, however, we cannot have confidence in such findings because the trial court did not use a valid representative witness group or consider individualized evidence that might have presented a more complete picture of the class. On remand, the trial court must start anew by assessing whether there is a trial plan that can properly address both common and individual issues if the case were to proceed as a class action.