Louis H. ERICHS, et al., Plaintiffs,

v.

VENATOR GROUP, INC., Defendant.

No. C 98–2981 SBA.

United States District Court,
N.D. California.

Jan. 23, 2001.

Mark R. Thierman, Thierman Law Firm, San Francisco, CA, for plaintiff.

Tracy Thompson, Brobeck Phleger & Harrison LLP, San Francisco, CA, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT

ARMSTRONG, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of Issues Related to Named California Plaintiffs [# 81–1]. The Court conducted a telephonic hearing with the parties on April 24, 2000. Based on its review of the issues after the hearing, the Court ordered supplemental briefing on June 9, 2000. Having now read and considered all the papers submitted in connection with this motion and the arguments advanced by the parties at the hearing and being fully informed, the Court hereby GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment or, in the Alternative, for Summary Adjudication.

## I. BACKGROUND [1]

California plaintiffs Vicki Flaxman, Jenee Geschwind, and Armida Montellano worked as store managers for Kinney

---

**1.** Unless a parenthetical cite to a specific declaration or other exhibit follows a particular statement in the Background section, the reader may conclude that the facts articulated here arise from the parties' Joint Statement of Undisputed Facts.

Shoe Corporation in California. Venator Group Retail, Inc., a wholly owned subsidiary of defendant Venator Group, Inc., operates Lady Footlocker and Kinney Shoe. Lady Footlocker and Kinney Shoe participate in the retail sale of shoes and related accessories.

Beginning on April 1, 1995, Kinney instituted a commission pay plan ("the Plan") for its store managers at stores located in California. Prior to implementing the Plan, Kinney had submitted a proposed plan, which was identical in all material respects to the Plan, to Jose Millan, the Assistant Chief of the California Division of Labor Standards Enforcement ("DLSE"). In a letter dated January 19, 1995, Kinney sought a written opinion as to whether the proposed plan would meet the requirements of the commission plan exemption set forth in Section 3(c) of California Industry Welfare Commission ("IWC") Wage Order No. 7–80, which provides:

> (C) Provisions of subsections (A) and (B) above [dealing with overtime pay requirements] shall not apply to any employee whose earnings exceed one and one-half (1–1/2) times the minimum wage if more than half (½) of that employee's compensation represents commissions.

In a February 9, 1995, letter of response, Millan, while stressing that the DLSE does not provide "blanket approvals of pay plans," determined that the proposed plan appeared to satisfy the criteria for the exemption from overtime pay requirements under 3(C) of IWC wage order 7–80.

On its face, the Plan guaranteed that store managers would earn a minimum hourly rate equal to 1.5 times the minimum wage for each hour worked and stated that managers would average between $11 and $14 per hour. Manager earnings would be derived from a commission on the store's sales. As the store's sales increased, the commission percentage dropped. The Plan applicable for "Metro" stores, those located in urban areas, and "Non–Metro" stores, those not located in urban areas, differed slightly. (Palardy Decl. at ¶ 4). These slight variations are reflected in the Metro and Non–Metro plans implemented on April 1, 1995:

| Metro | | Non–Metro | |
|---|---|---|---|
| Commission % | Weekly Sales | Commission % | Weekly Sales |
| 27.70% | Up to $2000 | 26.70% | Up to $2000 |
| 1.00% | $2001–$13000 | 1.00% | $2001–$13000 |
| .75% | $13001–$18000 | .75% | $13001–$18000 |
| .20% | $18001–$35000 | .20% | $18001–$35000 |
| .01% | $35001–and up | .01% | $35001–and up |

This basic framework for the Plan remained the same from April 1, 1995, until the termination date for the three California plaintiffs [2], although Kinney from time to time modified both the commission levels and the commission percentages. At *all* times during which the plaintiffs were paid under the Plan, their earnings exceeded one and one-half times the applicable minimum wage. Moreover, the primary duty of the plaintiffs throughout the term of their work under the Plan was to sell shoes, and they were expected to spend more than 50% of their time performing this duty.

Prior to implementing the Plan, defendant allegedly had employed a "salary" pay basis. (Palardy Decl. at ¶ 4). That plan, periodically referred to in the papers as a salary plus commission plan, capped a manager's potential weekly earnings at $706.00. (*Id.* at ¶ 7). Expensive litigation with parties claiming that this salary plan did not fit within the so-called "white-collar" exemption allegedly prompted defendant to consider a different pay structure. (*Id.* at ¶ 4). Defendant possessed two objectives in devising the new plan:

> First we wanted to establish a compensation plan for store managers in California that would stimulate an increase in sales; second, we wanted a plan that would, to the extent possible, insulate

**2.** Flaxman received payment under the Plan from April 1, 1995, until December 17, 1997, Geschwind received payment under the Plan from the week ending May 10, 1997, to August 8, 1997, and Montellano received payment under the Plan from April 1, 1995, until November 21, 1997.

the company from the repetitive fact-intensive and costly litigation that we have experienced in California in which we were required on an ongoing basis to defend the exempt status of our retail store managers under California law.

(*Id.*).

The parties agree that the Plan finally adopted was valid under *California* law from April 1, 1995, to October 1, 1996. Plaintiffs contest the validity of the Plan under California law after October 1, 1996, which marked the effective date for the increase in the minimum wage in California from $4.25/hour to $4.75/hour.[3] Plaintiffs challenge the validity of the Plan from its inception under *federal* law.

The parties agree that this motion raises only two issues:

> 1) Whether the Plan satisfies the requirements of Section 3(C) of IWC Wage Order 7–80 from October 1, 1996, through the respective termination dates of Flaxman, Geschwind, and Montellano; and
>
> 2) Whether the Plan satisfies all applicable requirements of the Fair Labor Standards act and regulations promulgated thereunder from April 1, 1995 through the respective termination dates of Flaxman, Geschwind, and Montellano.[4]

The parties further agree that plaintiffs' second, third, fourth, fifth, and sixth causes of action will be deemed adjudicated as to the three named plaintiffs if the Court finds that the Plan satisfies the requirements of Section 3(c) of IWC Wage Order 7–80. Similarly, the parties agree that plaintiffs' first and sixth causes of action will be deemed adjudicated as to the three named plaintiffs if the Court determines that the Plan satisfies the requirements of the Fair Labor Standards Act.

**3.** The $4.75/hour minimum wage remained in effect until February 28, 1997. From March 1, 1997, until August 31, 1997, $5.00/hour constituted the applicable minimum wage. From September 1, 1997, until February 28, 1998, the minimum wage was $5.15/hour.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Exemptions from Fair Labor Laws

■ The employer bears the burden of proof for establishing its claim to an exemption under the Fair Labor Standards Act. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–7, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Courts should construe exemptions narrowly against employers. *Klem v. County of Santa Clara,* 208 F.3d 1085, 1089 (9th Cir. April 3, 2000). A similar approach holds with respect to exemptions under California law. *See Nordquist v. McGraw–Hill Broadcasting Co.,* 32 Cal. App.4th 555, 562, 38 Cal.Rptr.2d 221 (Cal. Ct.App.1995).

**4.** In limiting the scope of the motion in this way, defendants are *not* conceding for the purposes of any future proceedings in this action that the three named plaintiffs are not exempt from the overtime requirements of federal and state law under *other* statutes or regulations.

## III. *DISCUSSION*

In their Joint Statement of Undisputed Facts, plaintiffs have defined the issues crisply for the Court. First, the Court must decide whether the Plan from its inception until the termination of plaintiffs' employment was valid under the Fair Labor Standards Act. Second, the Court must determine whether the Plan satisfied the requirements of Section 3(c) of IWC Wage Order 7–80 from October 1, 1996 through the respective termination dates of the plaintiffs.

### A. Fair Labor Standards Act

The Fair Labor Standards Act requires an employer to pay an employee one and one-half times the regular rate at which he is employed if he works a workweek longer than forty hours. 29 U.S.C. § 207(a)(1). An employer is not required to pay overtime to an employee of a retail establishment who has exceeded the applicable workweek if (1) the employee's regular rate of pay exceeds one and one-half times the minimum hourly rate applicable to him and (2) more than one-half of his compensation for a representative period consists of commissions on goods or services. *Id.* at 207(i).

The overtime exception requires an assessment of whether more than half an employee's compensation "represents commissions." When determining whether earnings constitute commissions, "all earnings resulting from the application of a **bona fide** commission rate shall be deemed commissions on goods or services without regard to whether commissions exceed the draw or guarantee." 29 U.S.C. § 207(i). (emphasis added). Citing to 29 CFR § 779.416(c), plaintiffs claim the instant plan does not include a "bona fide commission rate." In addition, plaintiffs contend that any commissions paid to them did not constitute more than 50% of their compensation.

■ Under federal law, the Plan's guarantee that managers will receive, as a minimum, hourly pay equal to one and one-half times the legal minimum does not mean that all compensation up to and including the amount of the guarantee is a salary for purposes of determining whether the amount of earnings attributable to commission constitutes more than 50% of the employee's compensation. As long as the payment plan is a bona fide commission plan, any compensation calculated as commission according to the plan qualifies as commission *even if* the employee's commissions for the week are less than the guarantee.[5] 29 CFR § 779.416(b). Congress did not define "bona fide commission rate." The inquiry is whether the employer set the commission rate in good faith. *Herman v. Suwannee Swifty Stores, Inc.,* 19 F.Supp.2d 1365, 1370 (M.D.Ga.1998).

The Code of Federal Regulations provides two examples of payment plans that are *not* bona fide. The first is a plan under which the employee, as a matter of fact, "always or almost always earns the *same* fixed amount of compensation for *each* workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee)." 29 CFR § 779.416(c) (emphasis added). The undisputed facts demonstrate that the plaintiffs in this case did not earn the same fixed amount of compensation for each workweek. During the course of their employment under the Plan, Flaxman's weekly earnings ranged from $641.22 to $828.33, Geschwind's from $575.22 to $616.97, and Montellano's from $609.91 to $750.56. Moreover, to the extent the Plan offered a guarantee of hourly pay equal to 1.5 times the minimum legal rate, the plaintiffs always earned more than this "guarantee." *Cf. Herman v. Suwannee Swifty Stores, Inc.,* 19 F.Supp.2d 1365 (M.D.Ga.1998) (finding that payment plan failed to comply

---

**5.** Plaintiffs allege that California law differs on this issue in that it requires the exclusion of the amount of any guarantee from the total amount of commission compensation. In other words, they claim that earnings that are guaranteed cannot constitute commission. *See infra.*

**1260**

with the requirements of § 7(i) for store managers who never received more than the plan's guaranteed rate or received the guaranteed rate only once in the entire year). The Plan does not fit within the first example of a non-bona fide plan.

The second example of a superficial commission plan that does not constitute a bona fide commission plan is "one in which the employee receives a regular payment constituting nearly his **entire** earnings which is expressed in terms of a percentage of the sales which the establishment ... can always be expected to make with only a **slight** addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota." 29 CFR § 779.416(c) (emphasis added). Although plaintiffs have adduced expert evidence indicating that the instant plan fits within this verbal formulation of a sham plan, the Court does not base its finding on this language.

The Court finds that the two examples in 29 CFR § 779.416(c) are not exhaustive. As a general matter, the term "bona fide commission rate" calls courts to consider whether the particular payment plan before it comports with Congress' purpose in exempting employers from paying overtime in certain situations:

> Congress did not state that any commission rate was fine ... Instead, it limited the exception [to the overtime pay requirement] to ensure employers would create a commission rate in **good faith**. Since Congress did not specify a definition of 'bona fide[,]' ... the [Department of Labor] did so through section 779.416(c). The DOL's interpretation is consistent with the purpose of passing an exception to overtime by paying commissions. The whole premise behind earning a commission is that the amount of sales would increase the rate of pay. Thus, employees may elect to work more hours so they can increase their sales, and in turn, their earnings. When a

commission plan never affects the rate of pay, the purpose behind using a commission rate also fails.

*Herman,* 19 F.Supp.2d at 1371 (emphasis added). By utilizing the term "bona fide" commission rate, Congress apparently envisions a smell test, one that reaches beyond the formal structure of the commission rate and into its actual effects and the purpose behind it. Accordingly, as evidenced by the two examples of non-bona fide commission rates provided by § 779.417(c), some payment plans that apparently are commission plans on their face may reveal themselves to be something different upon closer inspection. The "de facto" character of the Plan in this case is a relevant consideration.

Based on the evidence before the Court, a real question arises here whether the Plan provided managers a meaningful opportunity to elect to work more hours in exchange for higher pay. The graphs attached to the presentation of the new plan to the managers powerfully evidenced the similarities between pay under the old and new plans. (Carter Decl., Ex. AA at Ex. 1). Kinney even touted the new plan as allowing managers to approximate their current earnings. (*Id.*). Moreover, at the time it instituted the Plan, Kinney allegedly promised to pay managers at least their previous salary level even if the computation of commissions under the Plan fell below that amount.[6] (Flaxman Decl. at ¶ 4). These facts suggest an intent by defendant to replicate through a new form the results from the apparently legally nebulous old plan, thus raising a factual question about defendant's good faith.

Without question, the new plan opens earning levels unattainable under the old plan. A close inspection of the relevant figures, however, raises serious questions whether the Plan would, as defendant allegedly believed, "stimulate an increase in

6. The presence of downside protection, of course, is not synonymous with a sham commission rate plan. As already discussed, the regulations express comfort with the co-exis-

tence of a bona fide commission rate plan and downside protection. *See* § 779.416(a) and (b).

sales." When sales levels advanced a manager's "commissions" beyond the earnings limit of the prior plan, the marginal utility of further efforts by the manager to increase store sales shrunk, arguably, to a negligible level unlikely to induce him or her to devote further time to increasing sales. Viewing all of this evidence in the light most favorable to the plaintiffs, the Court finds a dispute of material fact exists regarding whether the commission rate is bona fide.

### 1. More than 50% in Commissions

Because plaintiffs have raised a dispute of material fact regarding whether the commission rate here is bona fide, a material dispute also arises whether more than one-half of compensation under the Plan consists of commission on goods or services. *See* 29 U.S.C. § 207(a)(1).

### B. IWC Wage Order 7–80

■ As a general matter, section 3(A) of the IWC Wage Order No. 7–80 requires employers to pay time and one-half or, in certain situations, double time overtime pay to employees working more than the standard workday (eight hours) or workweek (40 hours). Section 3(C) provides for an exemption from this requirement when an employee's earnings (1) exceed one and one-half times the minimum wage if (2) more than half of that employee's compensation represents commissions. "Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Ca Labor Code § 204.1. *Keyes Motors, Inc. v. Division of Labor Standards Enforcement*, 197 Cal.App.3d 557, 242 Cal.Rptr. 873 (1987), applied this definition of commission wages when assessing whether an employee's payments represent "commissions" under Order 7–80. *Keyes*, 197 Cal.App.3d at 561–3, 242 Cal.Rptr. 873; *see Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 800, 85 Cal. Rptr.2d 844, 978 P.2d 2 (1999). Thus, in order for an employee's wages to constitute "commissions" for the purpose of 7–

80, (1) his principal function must be selling a product or service and (2) the amount of his compensation must be a percent of the price of the product or service. *Id.* at 563, 242 Cal.Rptr. 873.

■ The statutory provisions concerning overtime payment deserve a liberal construction. *Ramirez*, 20 Cal.4th 785, 790, 85 Cal.Rptr.2d 844, 978 P.2d 2. Accordingly, a narrow construction applies to exemptions from the statutory mandatory overtime provisions. *Id.* The employer bears the burden of proving an exemption from the statutory overtime laws. *Id.*

When reading 7–80 in light of *Keyes*, four elements must exist for the exemption under 7–80 to apply. Plaintiffs must raise a dispute of fact involving at least one of these four elements in order for this Court to rule in their favor on the state law portion this motion.

### 1. Principal Function

The three plaintiffs sold products as their principal function. In that the parties stipulated to this fact, no material dispute of fact exists.

### 2. Compensation Must be a Percent of the Product's Price

The parties agree that at least some of plaintiffs' earnings constituted a percentage of the price of the products that they sold. (*See* Shelby Decl., Ex. AA at Exs. 10–12). Plaintiffs and defendants heatedly dispute *how much* of plaintiffs' earnings constitute earnings based on a percentage of the store's sales. The Court will entertain this dispute below. For present purposes, neither party maintains that the commission scheme performs no work. At least some of plaintiffs' earnings arose from a percentage of the products sold.

### 3. Earnings Exceed One and One-Half Times the Minimum Wage

The parties agree that plaintiffs' earnings under the Plan at all times exceeded

one and one-half times the minimum wage. Again, no material dispute of fact exists.

### 4. More Than One–Half of Employee's Earnings Represent Commission

The focal point of plaintiffs' argument under California law concerns whether more than one-half of plaintiffs' earnings represent commission. Unlike in the federal law context, plaintiffs do not allege that the plan was invalid at its outset. Instead, they claim that the Plan became invalid when the minimum wage increased on October 1, 1996. Their theory is simple: Kinney promised to pay managers at least one and one-half times the minimum wage; unlike in federal law, this "guarantee" under state law constitutes a salary; therefore, Kinney needed to pay its managers at least one and one-half times this salary in order to qualify for the overtime exemption under California law; once the minimum wage increased on October 1, 1996, plaintiffs' earnings no longer constituted more than one and one-half times the promised salary.

As an initial matter, the DLSE opinion letter commenting on plaintiffs' original plan provides little guidance for evaluating plaintiffs' argument. Although it concluded that Kinney's pay plan "appears" to qualify for the 3(C) exemption, it reached this decision when the minimum wage was $4.25 rather than $4.75. Plaintiffs do not contend that the plan did not satisfy 3(C) prior to the minimum wage hike. Thus, DLSE did not consider the specific issue before the Court.

A further preliminary comment bears notice. Plaintiffs *appear* to argue both that (1) section 3(C) itself establishes more than one and one-half times the applicable minimum wage as a salary in every case such that earnings from commissions (a) do not count as "commissions" until this salary floor is reached and (b) must amount by themselves to more than the amount of this floor and, in the alternative, (2) Kinney's *explicit promise* to guarantee a minimum hourly rate equal to 1.5 times the minimum wage provided for this sort of "salary" floor even if 3(C) by itself does not.

Before addressing each of these arguments in turn, the starting place in the substantive analysis is *Culpepper v. Hilltop Buick–Pontiac–GMC, Inc.*, Division of Labor Standards Enforcement, No. 07–33814(1) (April 18, 1998). In *Culpepper*, the employment agreement explicitly guaranteed the employee a minimum payment of $4,500 per month although it characterized only $1,800 as a base salary. In addition to this base $1,800 salary, the employee would receive a set percentage of the service department's customer receipts. During plaintiff's approximately six month employment, he exceeded the $4,500 monthly guarantee only once and only by a "minimal amount" (approximately $100). The DLSE determined that this payment plan did not qualify for the exemption under 3(C) because commissions did not make up more than one half of his compensation. The court stressed that the guaranteed $4,500 payment was not compensation amounting to a percentage of the price of products sold or services provided: "plaintiff's guaranteed minimum compensation was not 'based proportionately upon' the price of the products or services sold, as a guaranteed minimum, by definition, does not follow downward fluctuations of poor monthly sales as would a 'pure' commission system in which compensation is tied to a fixed percentage of such sales." *Culpepper* at ¶ 2 of Findings of Law.

The parties have not cited to one case either applying or rejecting *Culpepper*'s approach. Plaintiffs argue that *Ramirez, infra*, "adopted the same reasoning," but that argument fails. In *Ramirez*, the employer compensated the employee at a flat rate between $1,200 and $1,400 a month plus a percentage of the price of products sold when sales exceeded the flat rate. The lower court had determined that the employee constituted a commissioned employee, but the California Supreme Court remanded that issue because a question remained whether the employee even was

involved principally in selling a product or service, the first part of the two-part *Keyes* analysis for a commissioned employee. *Ramirez,* 20 Cal.4th 785, 800, 85 Cal. Rptr.2d 844, 978 P.2d 2. Because a remand was required on that question, the court elected not to determine whether the $1,200–$1,400 payment per month constituted a salary or a "draw" against future sales. *Id.* Plaintiffs cannot reasonably claim that *Ramirez* adopted the reasoning employed in *Culpepper.*

■ The DLSE possesses the authority to administer and enforce IWC orders. *Keyes,* 197 Cal.App.3d at 561, 242 Cal. Rptr. 873. A DLSE decision resolving a dispute in a particular case may constitute persuasive authority in "similar subsequent cases." *Tidewater,* 14 Cal.4th at 571, 59 Cal.Rptr.2d 186, 927 P.2d 296. It does not rise to the level of a regulation. *Id. Culpepper* is persuasive, if at all, only to the extent this case is "similar."

### a. Wage Order Argument

Plaintiffs' first argument, less prominent in their papers than their second argument, is that the wage order 7–80's threshold requirement that employees earn more than one and one-half times the applicable minimum wage constitutes a guarantee. Therefore, even if an employee's salary arises purely from commission, the guarantee amount of one and one-half the minimum wage must be subtracted from the total amount. According to this argument, the exception applies only if the amount remaining after this subtraction exceeds the amount of the guarantee. *Culpepper* provides no support for this position. It focused purely on the amount explicitly guaranteed by the employer and in no way suggested that the one and one-half clause in 3(C) constitutes an analogous "guarantee." Thus, plaintiffs have not provided any support for this wage order argument. The merits of their argument will receive consideration below.

### b. Explicit Guarantee

Plaintiffs' second argument concentrates on the explicit guarantee made and allegedly repeated by Kinney guaranteeing managers a minimum of 1.5 times the applicable minimum wage. Defendant downplays this "guarantee" as merely reiterating the requirement from 3(C).[7]

The facts in *Culpepper* are easily distinguishable from the instant case, and this factual difference demonstrates the instant case is not a "similar subsequent case." Whereas in *Culpepper* the employee only once earned more than the guarantee, the plaintiffs in this case earned more than one and one-half times the applicable minimum wage—the alleged guarantee—*every* pay period at issue. Kinney *never* used this guarantee as a basis for plaintiffs' pay. Moreover, the "guarantee" in this case essentially tracked the "guarantee" provided by 3(C).

Although the facts are easily distinguishable, the theory of *Culpepper* remains intact. *Culpepper* reasoned that a guaranteed minimum guards against downward fluctuations of poor monthly sales, thus protecting against the risks inherent in a pure commission system. The explicit guarantee made by Kinney in the instant case theoretically serves as an analogous downside protection even though it never applied as a practical manner.

The best conclusion is that the instant case is not a similar subsequent case to *Culpepper.* In drawing attention to the fact that the plaintiff actually received payment as a result of the guarantee in all but one of the months and in then stressing the small excess above the guaranteed rate in the one month in which it was not the source, *Culpepper* focused on a plan that did not just theoretically or occasionally provide downside protection but rather actually and persistently provided such protection. The facts of that case justifiably

**7.** This guarantee does not exactly track 3(C). Whereas section 3(C) requires compensation to "exceed" the 1.5 times mark, Kinney promised only that compensation would be *at least* the 1.5 times figure.

suggested that the guaranteed payment of $4,500 rather than the commission elements of the plan really drove the plaintiff's compensation. This case presents a radically different situation. Here, the 1.5 times guarantee is insignificant as a practical matter, thus obviating any concern that the guarantee rather than the commission plan is in fact the pay plan.

That conclusion does not end the analysis. Regardless of whether *Culpepper* applies to these facts, the question remains whether the guarantee implicit in 3(C) means the amount of money just in excess of one and one-half times the minimum wage cannot constitute commissions when determining whether more than ½ of the employee's total compensation represents commissions.[8] Without any authority on this issue, the Court is left to its own recourse in gleaning the intent of wage order 7–80. The Industrial Welfare Commission added section 3(C) to the wage order in 1976 "in recognition of special working conditions of 'big ticket' commissioned employees." *See* Wage Order 7–80, Statement as to the Basis upon Which Industrial Welfare Commission Order No. 7–80 Regulating Wages, Hours, and Working Conditions in the Mercantile Industry Is Predicated. The meaning of this term "big ticket" is unclear, prompting one court to label the term "ambiguous." *Keyes Motors*, 197 Cal.App.3d 557, 563 n. 3, 242 Cal.Rptr. 873 (1987).

■ Without any further guidance from the IWC as to the reason for this exception, the wage order's language must speak for itself:

> Provisions of subsections (A) and (B) above shall not apply to any employee whose earnings exceed one and one-half (1½) times the minimum wage if more than half (½) of that employee's compensation represents commissions.

Wage Order 7–80, 3(C). Under plaintiffs' reading, this language would mean that a worker's total earnings must exceed three times the minimum wage since the first one and one-half times the minimum wage earnings plus a cent constitutes a guaranteed salary and the commissions must constitute more than that one and one-half plus a cent. The language does not lend itself naturally to that interpretation. The term "earnings" encompasses salary and commission[9]; pursuant to this provision, only the "earnings" need exceed one and one-half times the employee's compensation for the exception to be implicated. Plaintiff's desired reading would require a dramatic alteration of the IWC so that it would read something similar to the following:

> Provisions of subsections (A) and (B) above shall not apply to any employee whose commissions represent more than one-half (½) of his total earnings, which shall constitute more than 3 times the minimum wage.

Under plaintiffs' system, a 100% commission payment plan would result in total earnings more than 3 times the minimum wage. The current language is not susceptible to this radical reading. The Court GRANTS defendant's motion for summary adjudication of the state law claim.

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Adjudication of the federal law claim is DENIED while its Motion for Summary Adjudication of the state law claim is GRANTED.

IT IS SO ORDERED.

---

**8.** Defendant in its reply cites to a provision from a DLSE manual while admitting that it is not entitled to any weight in light of *Tidewater, infra*. It claims that plaintiffs' citation to another provision from a DLSE Manual estopps plaintiffs from claiming that defen-

dant's citation should receive no weight. The Court disregards both citations.

**9.** Earnings includes "salaries and wages." *Black's Law Dictionary* (6th ed.1990). "Wages" includes "commissions." *Id.*