Filed 6/1/22  Kleinberg v. Landmark Dividend CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| PETER KLEINBERG, | B306650 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. YC071851) |
| LANDMARK DIVIDEND, LLC, et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, Deirdre H. Hill, Judge.  Judgment and postjudgment order affirmed.

Alston & Bird, James Abe, Christopher McArdle; Schnapper-Casteras,John Paul Schnapper-Casteras; Dorsey & Whitney and Kent J. Schmidt for Plaintiff and Appellant.

Procel Law, Brian A. Procel, Martin H. Pritikin; Miller Barondess, Andrew L. Schrader and Max W. Hirsch for Defendants and Appellants.

———————————————

## SUMMARY

Plaintiff Peter Kleinberg sued his former employer, Landmark Dividend, LLC, and related entities and individuals (collectively, defendants or Landmark), claiming defendants failed to pay him a commission in violation of the Labor Code and in breach of contract, and asserting numerous other causes of action based on the same facts. After a 31-day bench trial, the court issued a 33-page statement of decision rejecting all of plaintiff's claims. Among a host of other detailed fact findings, the court found plaintiff's testimony "was not credible in any respect."

In his opening brief, plaintiff fails to comply with the rules of court. He presents a biased summary of facts to support his position, omitting many of the significant facts found by the trial court. (See Cal. Rules of Court, rule 8.204(a)(2)(C).) Where the question is whether substantial evidence supports the judgment, "the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment." (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.) The obligation to present a fair summary " 'grows with the complexity of the record.' " (*Ibid.*)

Plaintiff has not presented a fair summary, and accordingly has waived the contention that any trial court finding was not supported by substantial evidence. (See *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) We therefore presume the record contains evidence to sustain every finding of fact.

In his reply brief, plaintiff informs us that is no problem, because "the parties actually agree on the central facets of the case," and his appeal "primarily raises questions of law." We disagree on both counts, and affirm the judgment.

The trial court also denied defendants' request for attorney fees under Labor Code section 218.5, finding plaintiff did not bring

or maintain the action in bad faith.  (Further undesignated statutory references are to the Labor Code, unless otherwise specified.)  Defendants appeal from that ruling, contending the trial court conducted an objective analysis of the merits of the suit, but should have conducted "a subjective analysis of [plaintiff's] motivations."  We find no error, and affirm the order denying attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    The Nature of the Case

The trial court aptly described the nature of the case this way:  "It is undisputed that Landmark paid Plaintiff a $25,000 commission.  Plaintiff claims that Landmark manipulated its formula for paying him a commission, and that he is actually entitled to a multi-million dollar commission.  Defendants claim that Plaintiff was not entitled to any commission under the formula, and that Landmark paid Plaintiff more than he was entitled to when it paid him a $25,000 discretionary commission."

### 2.    Overview of the Facts

We take these facts almost verbatim, but without quotation marks, from the trial court's statement of decision.  Our summary is mostly from the trial court's "overview of findings."  The court also made "detailed findings of fact," taking up a further 16 pages of the court's opinion.  We will describe any detailed findings in our discussion only as and when necessary to address plaintiff's arguments.  While plaintiff tells us the parties' summaries of the facts "align in most respects," they do not.  As the trial court stated, the parties presented "sharply divergent versions of many of the key facts."

In 2014, plaintiff began working in Landmark's finance department as the vice president of finance.  In 2015, plaintiff transferred from that position to a job as one of Landmark's vice presidents of acquisition (called VPAs).  VPAs were responsible for

3

identifying assets for Landmark to purchase. Landmark's business model was to acquire leases for cell towers, billboards, and renewable energy plans, and then package them into portfolios for sale to investor funds.

In his first transaction as a VPA, plaintiff identified a property consisting of 2,400 acres of land, several industrial buildings and wind leases, referred to as the Tehachapi deal. Landmark was only interested in purchasing the wind leases, but the seller, General Electric, refused to sell only the wind leases. Landmark ultimately agreed to bid on the package of assets, and was the high bidder at $8.2 million. The deal closed in December 2015.

At the time, Landmark compensated its VPAs with a combination of salary and commissions. The commission portion was calculated using the "VPA commission formula." Landmark explained the details of the formula to VPAs through presentations, handouts, and one-on-one meetings between the VPAs' manager and/or Landmark's underwriters and the VPAs. In 2015, there were three versions of the formula—one each for cellular, billboard, and wind—but each had a common variable: "cash margin."

Cash margin was Landmark's in-house metric for comparing the expected profitability of a project to a profitability benchmark for purposes of calculating VPA commissions. In 2015, for all three asset classes, Landmark calculated cash margin by taking a present value of an asset's anticipated future cash flows at a 9 percent discount rate and subtracting the total cost basis. When the calculated cash margin was positive, the VPA would be entitled to a percentage of it as a commission. On deals where the calculated cash margin was negative, the VPA was not entitled to a commission under the formula. However, in those cases, Landmark typically paid a discretionary commission.

4

Plaintiff was intimately familiar with the details of the formula. In addition to the resources available to all of Landmark's VPAs, plaintiff had worked with the formula before he became a VPA. During plaintiff's time in the finance department, George Doyle, Landmark's chief financial officer and plaintiff's immediate supervisor, trained plaintiff on the various aspects of the formula and its application to wind transactions, including how to calculate cash margin.

Before closing the Tehachapi deal, Landmark's underwriters calculated plaintiff's commission under the VPA commission formula and determined it was negative. The head underwriter, Jovanie Arias, walked through the calculations with plaintiff before the closing, and explained that he was not entitled to a commission under the formula. Immediately upon closing, plaintiff received e-mails showing that the deal would not entitle him to a commission.

Plaintiff was well aware from the very beginning that the formula would not entitle him to a commission. Early on in the process and at various times thereafter, plaintiff created detailed financial models that demonstrated Landmark owed him no commission for the Tehachapi deal.

Shortly after closing, Mr. Doyle and plaintiff discussed his commission. Mr. Doyle presented a discretionary commission structure, with $25,000 payable immediately and an additional $25,000 payable if and when plaintiff sold the industrial buildings. Plaintiff agreed to that structure. Landmark paid plaintiff the $25,000 commission, and plaintiff took steps to sell the industrial buildings pursuant to the parties' agreement. Landmark's payroll vendor erroneously processed a direct deposit of the entire $50,000 in early January 2016; Landmark reversed the mistaken deposit and made a new direct deposit for the correct amount. Landmark informed plaintiff and he did not object.

For the next six months, plaintiff raised no objection concerning his commission. In July 2016, seven months after closing, the parties discovered that the rental income from the Tehachapi deal would substantially increase starting in 2017. The increased rents made the Tehachapi deal substantially more profitable for Landmark than anyone had anticipated. When the transaction closed in December 2015, neither Landmark nor the seller, General Electric, were aware that the rent would increase in the future, since the increase was due to terms and conditions in an agreement to which neither Landmark nor General Electric were parties, and to which neither had access before closing.

After Landmark discovered the increased rents, plaintiff asked Landmark to recalculate his commission. However, Landmark's policy was not to revise commissions after closing if new information was discovered, whether that worked to the VPA's benefit or detriment. Plaintiff was aware of Landmark's policy not to revisit commissions. When Landmark did not accede to plaintiff's request for increased commission, he resigned.

3.     **The Procedural Background**

A few months after his resignation in November 2016, plaintiff brought this lawsuit. He filed the operative second amended complaint in December 2018, alleging 11 causes of action. Principal among them were a Labor Code claim for failure to pay wages and for related penalties; breach of contract; breach of the covenant of good faith and fair dealing; and unfair competition based on Labor Code violations, including section 2751. That provision requires a contract of employment involving commissions to be in writing and to set forth the method by which the commissions are computed and paid. (*Id.,* subd. (a).) Commission wages are defined (§ 204.1) as "compensation paid to any person for services rendered in the sale of such employer's property or

6

services and based proportionately upon the amount or value thereof."

The trial consumed 31 days in August and October through December 2019. The facts we have summarized were adduced in evidence. In its statement of decision, filed March 12, 2020, the trial court concluded its overview of findings by stating: "The evidence at trial showed that [plaintiff] was not entitled to any commission, and that [plaintiff] knew it from the outset. This lawsuit was motivated by [plaintiff's] greed and anger that Landmark would benefit from the increased future rents and he would not."

The trial court also separately described its findings on witness credibility, first observing that, throughout the trial, the parties presented "sharply divergent versions of many of the key facts concerning the VPA Commission Formula. Given that [plaintiff] alleged an oral agreement as to specific key aspects of the Formula, the credibility of witnesses was paramount in this case."

The court found defendants' witnesses "testified credibly about the details of the VPA Commission Formula." The testimony of two former Landmark underwriters was "especially credible, because they are former employees with no bias to please or help their former employer." Defendants' current employee witnesses "were also credible," and their testimony about the formula and the deal was consistent with the testimony from former employees.

The court continued: "In contrast, [plaintiff's] testimony was not credible in any respect. He presented shifting, contradictory stories during his testimony. [Plaintiff's] testimony was contradicted on numerous material points by his prior deposition testimony, pleadings, and declarations. His testimony was unconvincing and the Court has no confidence in Plaintiff's

7

versions of the facts. The Court has disregarded [plaintiff's] testimony on all disputed issues."

Further: Plaintiff "contradicted the other evidence presented in the case, as well as his own deposition testimony. His misrepresentations all served to advance a particular theme: that Landmark was taking advantage of his ignorance in bad faith. The evidence showed the opposite. [Plaintiff] was far from ignorant. On cross-examination, [plaintiff] was caught misrepresenting, among others, his knowledge of the Formula; his involvement with Landmark's due diligence process; his pre-closing efforts to sell the industrial buildings; and his communications with [General Electric]."

The court drew several conclusions of law pertinent to plaintiff's appeal.

First, plaintiff's claim for unpaid wages under the Labor Code failed, because under the terms of his employment and the VPA commission formula, plaintiff was not entitled to a commission—a fact of which plaintiff was fully aware.

Second, the breach of contract claim failed for the same reasons. The court rejected plaintiff's claims that all the disputed elements of the VPA commission formula were ambiguous, finding they were not. "In his role in the finance department, [plaintiff] was intimately aware of all aspects of the Formula, including the elements at issue in this case," and "[plaintiff's] wholly incredible testimony cannot create ambiguities where none exist." Further, the court found, "[k]nowing all of these details about the Formula, [plaintiff] affirmatively sought out a transfer to the renewables department so that he would have the opportunity to earn commissions under the Formula. . . . Nothing about [the VPA compensation program] was so unfair as to 'shock the conscience.' " And, plaintiff was "asking this Court to change Landmark's

8

commission formula from the agreed version to a new version of his own creation."

Third, defendants did not violate the implied covenant of good faith and fair dealing for the same reasons the first two claims failed. "In fact, Landmark has affirmatively established that it exercised good faith." (This was by offering the $25,000 discretionary commission despite plaintiff's lack of entitlement to a commission under the formula.) The court pointed out the implied covenant is limited to assuring compliance with the express terms of the contract, and "[h]ere Plaintiff is inappropriately attempting to use the implied covenant to rewrite the Parties' agreement and add new terms and obligations that were never contemplated."

Fourth, the court rejected plaintiff's contention defendants violated the unfair competition law (UCL, Bus. & Prof. Code, § 17200 et seq.) by employing him without a signed commission agreement in violation of section 2751. The court concluded that by its plain terms, section 2751 was inapplicable. A commission under section 2751 is compensation paid to an employee for work "in the sale of [the] employer's property or services" (§ 204.1). Plaintiff "did not sell property for Landmark; he bought property for Landmark." "The evidence of [plaintiff's] actual duties establish that as a VPA, he engaged in buying, not selling."

Moreover, the court found, even if section 2751 governed, the absence of a written commission agreement was an oversight. The evidence showed Landmark's standard practice for newly hired VPAs included having them sign a written commission agreement; plaintiff transferred internally, and did not sign the standard documents "purely due to an inadvertent administrative oversight, not by design. An unwitting, isolated violation cannot constitute an unlawful business practice under [the UCL]." And even if plaintiff could show a UCL violation, he did not show he would be entitled to any restitution. Plaintiff "presented no evidence that

9

Landmark wrongfully acquired any money or property from [plaintiff] because he did not sign Landmark's written commission agreement. Even if Section 2751 applied, [plaintiff] has not shown causation or any entitlement to monetary relief."

In addition to the principal conclusions just described, the trial court concluded plaintiff failed to establish several other claims. His causes of action for conversion and for improper collection of wages previously paid were based on Landmark's reversal of the $50,000 direct deposit in January 2016; the deposit was an error and plaintiff had no right to money deposited by mistake. His unjust enrichment cause of action failed because he was not owed any wages under the VPA commission formula. Declaratory relief was likewise denied. The court's findings that defendants paid all wages owed and did not violate the Labor Code would be binding on a jury, so those findings also effectively disposed of plaintiff's claim for wrongful constructive discharge, eliminating the need for a jury trial on that claim.

The court entered judgment on the statement of decision on March 12, 2020.

When plaintiff filed his complaint, he sought attorney fees under section 218.5. That section requires an award of attorney fees and costs to the prevailing party in an action brought for nonpayment of wages, if any party requests them when the action is initiated. But when the prevailing party is not the employee, attorney fees and costs are to be awarded "only if the court finds that the employee brought the court action in bad faith." (*Id.,* subd. (a).)

After a hearing on July 1, 2020, the trial court found defendants were not entitled to attorney fees and costs under section 218.5. The court stated:

"The court finds that plaintiff did not bring or maintain the action in bad faith. Plaintiff based his case on a calculation that

10

was founded on his theory and argument. Although plaintiff did not prevail on his calculation and recalculations, they were not necessarily made 'in bad faith.' The calculations were complex and were varied by both parties by fluctuation of various components [over time]. Although the rate and formula were known, despite plaintiff's assertions to the contrary, plaintiff's argument that the commission should be recalculated based on later known factors cannot be said to have been put forth 'in bad faith.' The absence of strong information on valuations and a clear-cut method of allocations leaves room for making arguments, albeit unsuccessfully. The court did not consider confidential settlement discussions. [¶] . . . [¶] Further, the court holds that none of the findings of this court's statement of decision amounts to a showing of bad faith."

Plaintiff filed a timely appeal from the judgment, and defendants timely appealed from the court's postjudgment order.

## DISCUSSION

### 1. Plaintiff's Appeal

Plaintiff contends the trial court misconstrued section 2751; failed to construe ambiguities in the VPA commission formula in favor of plaintiff; erred in analyzing the unconscionability of the VPA commission methodology; and ignored an employer's legal obligations when it corrected the value of its future rents from the Tehachapi deal for purposes of executive compensation but not for his commission. None of these claims has merit.

#### a. Section 2751

As already stated, section 2751 requires a contract of employment involving commissions to be in writing and to set forth the method by which the commissions are computed and paid. (*Id.,* subd. (a).) Commission wages are defined as "compensation paid to any person for services rendered in the sale

11

of such employer's property or services and based proportionately upon the amount or value thereof." (§ 204.1.)

As the trial court correctly found, the commission in dispute was not compensation paid for plaintiff's services in the sale of defendants' property. Plaintiff was vice president of acquisitions. His work was to acquire property, not to sell it, and the commission was not based, proportionately or otherwise, on the value of any sale of defendants' property.

Plaintiff insists "there was voluminous evidence" that he was "engaged in 'sales,' in both form and function." The trial court found otherwise, stating: "The evidence of [plaintiff's] actual duties establish that as a VPA, he engaged in buying, not selling." The court rejected plaintiff's emphasis on the evidence that the parties "used shorthand to refer to VPAs as being involved in 'sales.'" The court noted the principle that parties' labels will be ignored if their actual conduct establishes a different relationship, citing *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10–11; see *id.* at p. 11 ["determination (employer or independent contractor) is one of fact and thus must be affirmed if supported by substantial evidence"].)

Plaintiff contends the court failed to consider the basic rule that Labor Code provisions on wages are to be liberally construed to achieve their remedial purpose of protecting workers. Plaintiff cites *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785 (*Ramirez*). *Ramirez* involved construction of a wage order that exempted an individual who worked more than half the time in outside sales from overtime pay requirements. (*Id.* at p. 789.) The plaintiff performed both sales and delivery functions. (*Id.* at p. 802.) The court found that "the trial court's review of the evidence of whether [the plaintiff] was an outside salesperson was tainted by an interpretation of the term that was overly favorable to finding the exemption." (*Ibid.*; see *ibid.* [trial court must inquire

12

into the realistic requirements of the job, "first and foremost, how the employee actually spends his or her time"; "one who *only* performed these delivery tasks could not be considered a salesperson"].)  This case is nothing like *Ramirez.*

Notably, *Ramirez* also involved whether the plaintiff was primarily compensated through commissions.  *Ramirez* quoted with approval from a Court of Appeal decision:  " 'Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute "commission wages."  First, the employees must be involved principally in selling a product or service, not making the product or rendering the service.  Second, the amount of their compensation must be a percent of the price of the product or service.' " (*Ramirez, supra,* 20 Cal.4th at p. 804.)  Here, plaintiff was not involved in selling defendants' products or services, nor was his compensation a percent of the price.  Liberal construction does not permit us to construe an acquisition as a sale.

Plaintiff says he "fell prey to . . . a vague oral contract that resulted in significant confusion and litigation, [and] attractive promises of compensation that lured him in," only to face Landmark's contention that, under the "opaque commission structure," he was entitled to nothing.  This assertion is directly contrary to the trial court's fact findings, including that plaintiff "was well aware from the very beginning that the Formula would not entitle him to a commission."  We necessarily conclude that substantial evidence supports the court's findings, because plaintiff does not (and has forfeited the right to) contend otherwise.

b. **The claimed ambiguity in the VPA commission formula**

Next, plaintiff contends the commission structure "is ambiguous as a matter of law."  The ambiguities, plaintiff says, are interpreted against the drafter, particularly in the employment

13

context, and the court should have applied the covenant of good faith and fair dealing "to resolve the ambiguity and apply the contract fairly." Plaintiff cites cases supporting these general propositions which do not apply here.

As we indicated in the fact section (p. 9, *ante*), the court found no ambiguities in the VPA commission formula. Among other things, the court said this:

"Plaintiff argues that all of the disputed elements of the VPA Commission Formula are ambiguous. The Court finds that they are not. In his role in the finance department [before he became a VPA], [plaintiff] was intimately aware of all aspects of the Formula, including the elements at issue in this case. [Plaintiff] did not bring this case because of his good-faith confusion about how to calculate commissions under the Formula. . . . [Plaintiff's] wholly incredible testimony cannot create ambiguities where none exist."

As with plaintiff's previous argument, we necessarily conclude that substantial evidence supports the court's findings, because plaintiff has disavowed any contrary contention. Plaintiff simply recites facts as he wishes them to be. For example, plaintiff says: "Landmark's calculations were opaque and unexplained to [plaintiff] as he diligently worked to land the deal." But the trial court found—with respect to the discount rate that plaintiff disputed—that plaintiff "knew a 9% discount rate was used to calculate asset sale value prior to becoming a VPA. During his time in the finance department, Plaintiff needed to understand the details of the Formula, since his responsibilities included running commission calculations for forecasting and modeling purposes. [Plaintiff] was trained by Doyle that cash margin for commission was calculated using a 9% discount rate for all asset classes, including wind deals."

14

And yet plaintiff claims the calculations were "unexplained" to him, and the trial court "was not certain about what the contract meant." Plaintiff's claims of ambiguity and, as a consequence, trial court error "in declining to apply longstanding cannons [*sic*] of construction" in his favor, are entirely without merit.

### c.    The unconscionability claim

Plaintiff contends Landmark's "ambiguous, impenetrable, and oral" VPA commission formula was procedurally and substantively unconscionable.

First, plaintiff asserts the court "did not resolve the matter," but it did. The court stated: "Knowing all of these details about the formula, [plaintiff] affirmatively sought out a transfer to the renewables department so that he would have the opportunity to earn commission under the Formula. This shows that the VPA compensation program was very attractive to [plaintiff]. Nothing about it was so unfair as to 'shock the conscience.' [¶] Even if the Court found that the VPA Commission Formula were unconscionable, it would still not be proper to rule as Plaintiff suggests. He is asking this Court to change Landmark's commission formula from the agreed version to a new version of his own creation."

Plaintiff then cites various precedents on the unconscionability doctrine, none of which operates to demonstrate error in the trial court's conclusion. Plaintiff insists otherwise, pointing to the absence of a signed contract; "unfair surprise"; a key term ("cash margin") leading to materially different results depending on use of a "cap rate" of 6.5 percent or a discount rate of 9 percent; a "commission methodology that was perennially manipulable and literally incalculable"; and "numerous hallmarks of unfairness." All these assertions get plaintiff nowhere, as he again ignores the trial court's findings of fact.

15

### d. The covenant of good faith and fair dealing

Finally, plaintiff asserts that, for purposes of determining executive compensation, defendants increased the valuation of the wind leases when they discovered, many months after the closing, that the future rents would be significantly greater than previously anticipated—but defendants did not recalculate his commission. This, plaintiff says, violates the covenant of good faith and fair dealing.

Of course, it does not. "It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.) The purposes and terms of the VPA commission formula have nothing to do with executive compensation. As the trial court properly concluded, plaintiff "is inappropriately attempting to use the implied covenant to rewrite the Parties' agreement and add new terms and obligations that were never contemplated." This claim, like the others, fails.

### 2. Defendants' Appeal

As already mentioned, section 218.5 requires an award of attorney fees to the prevailing party in an action for nonpayment of wages, but when the prevailing party is the defendant, fees and costs are to be awarded "only if the court finds that the employee brought the court action in bad faith." (*Id.,* subd. (a).)

Defendants contend the trial court made two errors when it ruled plaintiff did not bring or maintain the action in bad faith. The first was that the trial court conducted an objective analysis of the merits of the suit, rather than a subjective analysis of plaintiff's motivations. The second was that the court "assumed that a single nonfrivolous argument could supply good faith for the action as a whole." We disagree with both claims.

16

### a. The hearing on attorney fees

We have quoted the trial court's order explaining its decision declining to find the bad faith necessary for an award of attorney fees to defendants (*ante,* at pp. 10-11). We add to that recitation a further description of arguments at the hearing.

Defendants quoted various of the trial court's findings in its statement of decision on the merits, contending that these were "predicate facts" that "rise to the level of bad faith." These findings all involved the fact that plaintiff knew from the very beginning that he was not entitled to a commission under the formula. Thus the court found, in its statement of decision:

"[Plaintiff] did not bring this case because of his good faith confusion about how to calculate commissions under the Formula. He brought it because of his greed and anger that Landmark benefitted from the future rents." Defendants in their opening brief also cite a similar finding, that "[t]his lawsuit was motivated by [plaintiff's] greed and anger that Landmark would benefit from the increased future rents and he would not." Other findings were that plaintiff "was well aware from the very beginning that the Formula would not entitle him to a commission"; "[t]he evidence presented at trial showed that, throughout the process, [plaintiff] was fully aware that the Tehachapi Project would not yield a commission under the Formula"; and plaintiff "accepted the $25,000 because he knew that he was not entitled to any commission under the Formula." The court also found plaintiff's testimony "was not credible in any respect," and that his "misrepresentations all served to advance a particular theme: that Landmark was taking advantage of his ignorance in bad faith," but "[t]he evidence showed the opposite. [Plaintiff] was far from ignorant."

However, as the trial court pointed out, there was more to the case than the parties' extensive disputes over the several

17

factors that comprised the commission formula, all of which were determined as of the time of closing, and all of which plaintiff knew from the outset. But many months after the closing, it was discovered that the future rents would increase substantially, making the deal much more valuable to defendants.

One of plaintiff's principal arguments was that his commission should be recalculated using the new rents figure, despite defendants' policy that commissions are never revised after the closing. While the court found this to be a losing argument, the court was very clear that this argument was not brought in bad faith. At the hearing, the court made several relevant observations, explaining:

"[I]n my view, the [bottom] line, when I think of it in substance is *the fact that the deal ended up being worth more than was anticipated at the time of closing, was something that was central to plaintiff's argument and didn't win, but basically in my view is a good faith basis for bringing the action, even though he understood what the difference is in the formula and the cap rate, the discount rate and everything else.* [¶] There was in clear, definitive discussion of the moment in time that you evaluate this is the moment of closing. It seems to me logical and necessary that that was the case, but for him to have made an argument that it was something else doesn't amount to bad faith." (Italics added.)

After further argument about the court's findings that plaintiff always knew the formula would not entitle him to a commission, and brought the case "because of his greed and anger that Landmark benefited from the future rents," the court stated:

"He [plaintiff] wasn't confused which [were] the rates to be used. He knew what they were, he worked in that office, et cetera. Whether he agreed or disagreed, in my view, with what the valuation should have been, or whether it should have been a moving target or not are different issues. And to me, it's a basis

18

for a different theory.  *I think the level of bad faith that you have to show does not—none of the things that you have related that I have found and adopted from the statement of decision do I think amounts to a showing on the criteria of bad faith.  I just don't.*

"So you can say it's inconsistent in your view, but to me it's not.  They're not mutually exclusive.  I think you're marrying different standards, in my view, and whether he either brought it or maintained it in bad faith, the answer, I think, is no.  [¶]  I think they [plaintiff] lost for the reasons that you're saying, *but I don't see that as being a showing that you would need to make of bad faith.  I just don't see it.*"  (Italics added.)

And, at the end, the court said:  "But you know how they say some things you know when you see it?  I think bad faith is one of those things within the discretion of the trial judge to know it when I see it, and this doesn't ring like that for me."

### b.    The law

In the trial court, defendants argued that plaintiff was liable for attorney fees "regardless whether this Court applies a subjective or frivolous standard."  Now, defendants say the inquiry is confined to subjective bad faith, and "applying an objective test to the subjective bad-faith inquiry is reversible error."

Defendants are mistaken for several reasons.

First, section 218.5 does not define "bad faith."  And the single case that has addressed the bad faith standard under section 218.5 reaches a conclusion contrary to defendants' claim.

In *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, the court stated:  "The legislative history [of section 218.5] indicates the Legislature intends employers to recover fees when they 'defeat frivolous claims,' which 'would align the statute with the state and federal civil rights and employment statutes.'  (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 462 (2013–2014 Reg. Sess.) July 2, 2013, p. 4.)  Thus,

19

defendants would be entitled to attorney fees only if [the plaintiff's] wage claim was frivolous." (*Id.* at p. 545, fn. omitted; *id.* at pp. 556–557 [remanding for a determination whether the wage claim was frivolous].)

Second, the trial court's statements at the hearing and its minute order do not in any event show the court conducted merely "an objective analysis of the merits of the suit," as defendants claim. I "know it when I see it" is not objective; it is subjective. The court referred to "the level of bad faith that you have to show," and concluded that none of its findings in the statement of decision "amounts to a showing on the criteria of bad faith." Similarly, "they [plaintiff] lost for the reasons that you're saying, but I don't see that as being a showing that you would need to make of bad faith."

Defendants rely on *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1 (*Smith*). *Smith* involved Business and Professions Code section 809.9, providing for an award of fees to a "substantially prevailing party" in a peer review lawsuit, if the other party's conduct in bringing or litigating the suit was "frivolous, unreasonable, without foundation, or in bad faith." (§ 809.9.) *Smith* held that "because objective standards are contained in the other three grounds listed in section 809.9, we conclude that the term 'bad faith' establishes a subjective standard concerned solely with whether the motive underlying the losing party's conduct was improper. We further conclude that a party's conduct can be attributed to improper motives and, thus, constitute bad faith for purposes of section 809.9 even if that party's conduct could otherwise be found acceptable under the three objective criteria of section 809.9." (*Smith,* at p. 35.)

We see no reason to construe section 218.5 in the same way *Smith* construed section 809.9 of the Business and Professions Code. *Arave* and the legislative history of section 218.5 clearly

20

suggest otherwise, and we find no basis to disagree, at least to the extent *Arave* holds that a frivolous claim—an objective criterion—is encompassed within the bad faith standard.

Defendants' view seems to be that "bad faith" under section 218.5 should be construed as having *no* objective element. That may be appropriate in other circumstances under other statutes, as in *Smith*, but it is not appropriate here. The legislative history of section 218.5, as explained in *Arave*, makes clear there is no basis for requiring the trial court to ignore objective criteria in making its bad faith determination under section 218.5. Indeed, the *Smith* case observes that "not all courts have construed the term 'bad faith' as imposing solely a subjective standard." (*Smith, supra,* 188 Cal.App.4th at p. 34.)

Third, *Smith* provides useful guidance in defining improper motives for purposes of determining subjective bad faith. Those included " 'some interested or sinister motive,' " " 'a state of mind affirmatively operating with furtive design or ill will,' " "actual malice," "ill will," "personal animosity," and so on. (*Smith, supra,* 188 Cal.App.4th at pp. 34, 35.) Here, the court said in its statement of decision that the lawsuit was motivated by plaintiff's "greed and anger that Landmark would benefit from the increased future rents and he would not." If the motivating influence of "greed and anger" were sufficient to warrant a finding of bad faith, there would be a great many more attorney fee awards. We cannot equate "greed and anger" with actual malice or ill will or furtive design or personal animosity, where there was an arguable basis, identified by the trial court, for litigating the suit.

In short, we decline to inhibit the trial court's analysis of bad faith by requiring it to ignore any "objective criteria." Accordingly, we find no basis to conclude the trial court applied the wrong standard in assessing whether plaintiff brought or maintained the court action in bad faith. (§ 218.5, subd. (a).)

21

Defendants make an alternative argument, contending that if bad faith under section 218.5 includes "some objective element akin to frivolousness, the trial court applied the wrong standard for frivolousness." Defendants say the presence of a nonfrivolous issue "cannot defeat a showing that the case as a whole was frivolous." For this assertion, defendants cite cases involving sanctions for a partially frivolous appeal or a partially frivolous complaint and a case involving malicious prosecution.

But this is not a case involving sanctions. This is not a malicious prosecution action either. This is an action for unpaid wages under the Labor Code, and one in which the court found all the other causes of action were inextricably intertwined with the wage claims and based on the same factual allegations. Had plaintiff prevailed on his assertion that his commission should have been recalculated to account for the unexpected increase in future rents—an argument the court found "cannot be said to have been put forth 'in bad faith,' "—the outcome of the entire case would have been different. Under these circumstances, defendants' claim that "the trial court applied the wrong standard for frivolousness" has no basis in fact or support in law.

## DISPOSITION

The judgment is affirmed. The order denying attorney fees is affirmed. The parties shall bear their own costs on appeal.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.          WILEY, J.


22