Filed 8/20/25  Myers v. Quality Care Home CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| BRENDA MYERS, | C101659 |
| Plaintiff and Respondent, | (Super. Ct. No. CVCV21-0198789) |
| v. | |
| QUALITY CARE HOME, INC., et al., | |
| Defendants and Appellants. | |

Plaintiff Brenda Myers filed a lawsuit for unpaid overtime against her former employer, defendant Quality Care Home, Inc. (QCH).  Following a bench trial, the trial court found she was owed almost $40,000 in unpaid overtime, liquidated damages, penalties, and prejudgment interest, and also awarded her approximately $78,000 in attorney fees.  QCH appeals, arguing the evidence does not support the trial court's finding it knew or should have known Myers was working overtime, and, alternatively, Myers was not entitled to overtime when she worked as a caregiver rather than an administrator.  It also argues the fee award should be reduced.  We disagree with the first

1

two arguments and find we have no jurisdiction to consider the third because QCH did not appeal the fee award. We thus affirm the judgment in full.

## FACTUAL AND PROCEDURAL BACKGROUND

QCH operates several 24-hour residential care facilities for the elderly. Defendant Gurmeel Singh is the corporation's sole director, chief executive officer, and chief financial officer. Singh's wife, Reema Singh is the corporation's only other officer. Myers was employed by QCH from approximately July 2020 to September 2021. Thereafter, she sued QCH and Gurmeel Singh for failure to pay overtime, among other things.[1]

A one-day bench trial was held. Myers and Singh both testified and numerous exhibits were admitted.

Myers testified she was employed by QCH as an administrator. As the title suggests, her duties were primarily administrative and included overseeing the day-to-day operations of five residential care facilities. Her normal work schedule was from 8:30 a.m. to 5:00 p.m., Monday through Friday. QCH also employed caregivers who were responsible for providing care to the residents of the facilities, and they generally worked 12-hour shifts, from 7:00 a.m. to 7:00 p.m. or 7:00 p.m. to 7:00 a.m. On occasion, Myers worked as a caregiver due to staffing limitations.

Myers prepared and submitted her own timesheets, and these timesheets were admitted into evidence. On all but one of her timesheets, she reported she worked Monday through Friday, eight hours per day (from 8:30 a.m. to 5:00 p.m.), and 40 hours per week, with no overtime. On one timesheet for the pay period ending April 30, 2021, she reported 22.75 hours of overtime and two hours of double time (and this is the only timesheet on which she reported overtime). She testified she was properly paid for all

---

[1]     Because we conclude we have no jurisdiction to review the fee award, her other claims are not relevant to this appeal.

2

hours she reported on her timesheets.

Myers also testified, however, that her timesheets were not accurate, and that she regularly worked more than eight hours per day and more than 40 hours per week. She testified this extra (i.e., overtime) work was done with Singh's knowledge because, before she started working for QCH, Singh instructed her to log 40 hours of work per week on her timesheet and to keep track of her excess time worked so that she could be compensated with time off rather than salary. She was asked, "What did [Singh] instruct you exactly," and she responded, "that I would log my 40 hours on my pay sheet and then track the hours that I worked over in order to basically flex my hours and take time off at a later date." She reiterated Singh instructed her to "keep track of [her] hours in order to use the overages to take time off later."

Myers testified she kept handwritten notes keeping track of her overtime hours, first in a notebook and then on a desktop calendar, and copies of these notes were admitted into evidence. She testified she made these notes either before she left work for the day or first thing the next morning. When asked why she created these notes, she responded, "In order to do as [Singh] said, keep track of my hours in order to use the overages to take time off later." Myers acknowledged she never showed the notebook or the calendar to Singh or his wife.

Singh denied that he told Myers to report only 40 hours a week on her timesheet and to keep track of her overtime hours and take that time off at a later date. He testified Myers had "two conditions" in working for QCH. First, she was going to school and stated she would need time off during the days; and second, she stated, "she wanted to get paid 40 hours a week at least." Singh testified, "We accommodated her. We said . . . that's fine. You can go to school in the office. We set up a computer, a second computer, for her in the office, which she used. . . . [¶] And then we talked about how her schedule is going to work because she's going to be taking classes on some days. And . . . I told her as long as she doesn't go over 8 hours a day or 40 hours a week, I'm fine with that.

3

She can make her schedule that way." He testified he was not aware Myers was working unreported overtime, and if he had been aware, "[he] would have paid her like [he] paid every other employee overtime."

Singh also testified he told Myers, "I don't want her doing overtime if it's going over eight hours a day or 40 hours a week," and, "if she has to do overtime, she needs to make me aware. She has to let me know." Myers denied this. She was asked, "[Singh] told you, didn't he, to not work over 40 hours in any week; is that true?" She responded, "No. He told me to document anything that I worked over in order to take another day off or time off at a later date."

The trial court found Myers' testimony on this issue was more "credible" or "reasonable" than Singh's because, "absent some sort of agreement with Defendants, [Myers] would have no reason to track her time not reported on her timecards. The fact that she did so suggests a reason and motivation to accurately capture her time worked to take advantage of the offer of 'comp time' made by Defendant Singh."

Myers also testified she received and made phone calls and texts from and to Singh and his wife outside of working hours and over 300 pages of her personal cell phone records were admitted into evidence. The trial court found these records showed "a consistent pattern of work-related calls outside of" her regularly scheduled work hours.[2] "For example, for the period between Saturday, July 19, 2020, and Monday, August 31, 2020, [Myers] made or received work-related calls outside of her working schedule on 35 out of 44 days. For the 30-day period of November 19, 2020, to December 18, 2020, [Myers'] records show work-related, outside of shift phone activity on 27 of the days. A similar pattern is evidenced throughout the records. Indeed, many of the calls occur on weekend days in which [Myers'] timecard reflects no work. Further,

---

[2] Although Myers highlighted the calls that were work-related, the highlighting is not visible on the documents that are part of the record on appeal.

4

many of these phone conversations were with either Defendant Singh or his wife . . . . The mere fact that these conversations were taking place on such a consistent basis shows that Defendants knew that [Myers] was working beyond the time she reported on her timecards."

The trial court found Myers met her burden of proving she worked over $13,000 worth of overtime and double time with QCH's knowledge and acquiescence, and she was also entitled to liquidated damages, various statutory penalties, and prejudgment interest thereon. On May 6, 2024, judgment was entered for Myers and against QCH and Singh in the amount of $39,954.08.

A week later, on May 13, 2024, Myers filed a motion for attorney fees pursuant to several Labor Code provisions. She sought almost $110,000 in fees, which represented 243.9 hours of work at a rate of $450 per hour. QCH argued the fees sought should be reduced because Myers achieved only limited success, some of the hours were unreasonable, $450 per hour was too high, and a negative multiplier was appropriate. The trial court reduced both the number of hours and the hourly rate but declined to find Myers achieved only limited success or that a negative multiplier was appropriate. On July 11, 2024, it entered an order awarding Myers $78,715 in attorney fees.

On July 12, 2024, QCH and Singh (hereafter sometimes collectively referred to as QCH) filed a notice of appeal from the May 6 judgment.

**DISCUSSION**

I

Standard of Review

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all

5

reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "Our review begins and ends with our determination of whether there is any credible evidence which could support the judgment. [Citation.] We may not weigh the evidence or consider the credibility of witnesses. We must indulge every legitimate inference from the evidence in plaintiff's favor and accept as true any reasonable evidence in favor of plaintiff, disregarding conflicting evidence." (*Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1622-1623.) "A fundamental corollary to the substantial evidence rule is the ' "conflicting inference" rule' by which 'the appellate court must indulge all *reasonable* inferences that may be deduced from the facts *in support of the party who prevailed* in the proceedings below.' " (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 621.) If the trial court's findings are supported by substantial evidence, we will uphold them even though " 'we might have reached a different conclusion had we been the fact finders in this case.' " (*People v. Woods* (1999) 21 Cal.4th 668, 674.)

II

Unpaid Overtime

Under California law, nonexempt employees like Myers are entitled to overtime at one and a half times their regular rate of pay for all hours worked over eight hours in one day or 40 hours in one week.[3] (Lab. Code, § 510, subd. (a); see *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 789; *Martinez v. Landry's Restaurants, Inc.* (2018) 26 Cal.App.5th 783, 796.) The term " 'hours worked' " " 'includes all the time the employee is suffered or permitted to work.' " (*Morillion v. Royal Packing Co.* (2000)

---

[3] Employees are also entitled to overtime for the first eight hours worked on the seventh day of work in any one workweek, and to double time for all hours worked over 12 hours in one day, and any work in excess of eight hours of any seventh day of a workweek. (Lab. Code, § 510, subd. (a).)

6

22 Cal.4th 575, 582.) " ' "[T]he words 'suffer' and 'permit' . . . mean 'with the knowledge of the employer.' " [Citation.] Thus an employer who knows *or should have known* that an employee is or was working overtime must comply with' " overtime requirements. (*Id*. at p. 585, italics added.) Thus, " 'where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation' " of the law. (*Jong v. Kaiser Foundation Health Plan, Inc.* (2014) 226 Cal.App.4th 391, 395.) But an employer may not escape responsibility for paying overtime by " 'turning its back on a situation,' " and it must pay overtime for "off-the-clock" or unreported overtime work if it has "actual or at least *constructive knowledge* that [an employee] was working more than the hours he reported." (*Id*. at pp. 395, 396, italics added; see also, e.g., *Tele-Count Engineers, Inc. v. Pac. Tel. & Tel. Co.* (1985) 168 Cal.App.3d 455, 465 [equating "constructive" knowledge with that which the defendant "should have known"].)

QCH does not challenge the trial court's finding that Myers worked the overtime hours she testified she worked. Instead, it challenges the trial court's finding that it knew or should have known she worked those hours. It argues it "did not know and had no reason to know that she had been underreporting her hours worked." The trial court found otherwise, and its finding is supported by substantial evidence.

QCH's argument that it did not know or have reason to know Myers was working unreported overtime is based largely on Singh's testimony and it ignores Myers' contrary testimony. QCH forgets that " '[a] party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]' [Citation.] Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' "

(*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

The evidence supports the trial court's finding that QCH knew or should have known that Myers was working unreported overtime. "The testimony of one witness, even that of a party, may constitute substantial evidence." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 703.) Myers testified Singh instructed her to keep track of her overtime hours and to take that time off at a later date, and this testimony alone is sufficient to support the trial court's finding Singh knew or at least should have known Myers was working unreported overtime. But Myers' testimony is not the only evidence on this issue. Her detailed records of the overtime she worked provides further support for the trial court's finding. As the trial court found, Myers would have no reason to keep such detailed records absent the type of arrangement she testified to (i.e., that Singh instructed her to keep track of her overtime hours and take the time off at a later date).

Although Singh denied he instructed Myers to keep track of her overtime hours and take that time off at a later date, the trial court was not required to credit his testimony, particularly where, as here, it found Myers' testimony was more credible and reasonable. (See *Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1254.) "[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204; see also *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["[a] trier of fact is free to disbelieve a witness . . . if there is any rational ground for doing so"].) We find nothing arbitrary or irrational in the trial court's rejection of Singh's testimony that he did not instruct Myers to keep track of her overtime hours and take that time off at a later

date.

Myers' phone records also provide further support for the trial court's finding QCH knew or should have known she was working overtime. The trial court found those records show Myers had consistent communications with Singh and his wife outside of her regular working hours. QCH argues the phone records may show the Singhs had knowledge Myers was working outside her regular working hours on those occasions when she talked to them, but it contends the records do not support a finding they had knowledge she worked "*all* of the unreported hours that she claims to have worked." In other words, QCH contends that, unless Myers talked to one of the Singhs outside of her regular working hours on a particular day, there is no evidence they had knowledge she was working outside of her regular working hours on that particular day.

The trial court found, however, "[t]he mere fact that these conversations were taking place *on such a consistent basis* shows that Defendants knew [Myers] was working beyond the time she reported on her timecards." (Italics added.) The evidence supports this finding, particularly where, as here, QCH fails to cite or address the evidence in any meaningful way. Instead, it merely states, with no discussion, that "it is clear from [Myers'] cellphone records that the vast majority of the claimed calls were not with either of the owners (*see* 1 RT 126:10-17; Plaintiff's Exhibit 1-F, 1 CT 158-513.)" On the cited page of the reporter's transcript, Singh identified his phone number and his wife's phone number and Exhibit No. 1-F, which is found at pages 158 through 513 of the clerk's transcript, consists of Myers' phone records. It is not our job to comb through over 350 pages of phone records first to identify those calls that are to or from one of the Singhs' phone numbers, and then to determine whether the calls occurred outside Myers' regular work schedule. (See *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879 ["It is not the function of this court to comb the record looking for the evidence or absence of evidence to support defendant['s] argument"]; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 ["The appellate court is not required to search the record

9

on its own seeking error"].) We stress again that "the trial court's judgment is presumptively correct, such that error must be affirmatively demonstrated . . . . [Citations.] This means that an appellant must do more than assert error and leave it to the appellate court to search the record . . . to test his claim. The appellant must present an adequate argument including citations to . . . relevant portions of the record." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557.) "[T]his means that an appellant who challenges a factual determination in the trial court—a jury verdict, or a finding by the judge in a nonjury trial—must marshal *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding." (*Ibid.*) QCH fails to marshal all of the evidence and affirmatively demonstrate it is insufficient to sustain the challenged finding.

### III

### Alternative Workweek Schedule

QCH also argues that, even if Myers sometimes worked over eight hours a day, she was not entitled to overtime when she worked 12-hour caregiver shifts because caregivers were subject to an alternative workweek schedule. We are not convinced by this argument.

As noted above, QCH employs caregivers who are responsible for providing care to the residents of each facility, and caregivers typically work a 12-hour shift, from 7:00 a.m. to 7:00 p.m., or vice versa. The trial court found QCH's employees are covered by Industrial Welfare Commission wage order No. 5-2001 (Cal. Code of Regs., tit. 8, § 11050; Wage Order 5), which governs the public housekeeping industry, and neither party challenges this finding.[4] Pursuant to that wage order, if an employer in the

---

[4] The public housekeeping industry "means any industry, business, or establishment which provides meals, housing, or maintenance services . . . and includes . . . rest homes,

10

healthcare industry (which includes residential care facilities) properly institutes an alternative workweek schedule, employees may work up to 12 hours per day without the payment of overtime compensation. (Wage Order 5, subds. 2(L) & 3(B)(8).) The trial court found QCH had instituted an alternative workweek schedule for caregivers.

Myers was an administrator, not a caregiver, and thus was not subject to the alternative workweek schedule. She testified, however, that she sometimes worked as a caregiver depending on staffing issues. According to the notes she kept to document her overtime hours, on some days she worked from 7:00 a.m. to 7:00 p.m. She was asked whether she was "acting as a caregiver on those days," and she responded, "Those are caregiver hours, but I can't be certain. Without seeing a schedule in front of me, I don't know. [¶] . . . [¶] They are definitely caregiver hours, but I cannot guarantee that I was working just in the capacity of a caregiver for those 12 hours."

QCH argues Myers is not entitled to overtime for those days on which she worked a 12-hour caregiver shift because those shifts are subject to a valid alternative workweek schedule. To support its argument, it cites a provision in Wage Order 5 that states if a validly instituted alternative workweek schedule is adopted, "The same overtime standards shall apply to employees who are temporarily assigned to a work unit covered by this subsection." (Wage Order 5, subd. 3(B)(8)(d).) The trial court rejected QCH's argument, noting that, "while [Meyers] may have covered some caregiver shifts, her position was not a caregiver position. She worked a different job classification with different duties. Her position was not exempt from normal overtime rules when she temporarily covered for other staff members." QCH quotes the trial court's findings, and then writes: "Therefore, the trial court's ruling that [Myers] was not subject to a valid [alternate work schedule], even when she worked entire shifts as a Caregiver, is

---

. . . homes for the aged, and similar establishments offering board or lodging in addition to . . . aged . . . care." (Wage Order 5, subd. 2(R)(4).)

reversible error." That is the extent of its argument on this issue. "An appellant has the burden to demonstrate reversible error with reasoned argument and citation to authority. [Citations.] When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited." (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.) Arguably, we would be justified in treating this point as forfeited because QCH "failed to adequately brief the issue." (*Ibid*.)

Even if we consider this argument on the merits, however, we reject it. As Myers accurately notes, "the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." (*Ramirez v. Yosemite Water Co., supra*, 20 Cal.4th at pp. 794-795.) "[W]e narrowly construe exemptions against the employer, 'and their application is limited to those employees plainly and unmistakably within their terms.' " (*Peabody v. Time Warner Cable, Inc.* (2014) 59 Cal.4th 662, 667.) A claim that an employee is not entitled to overtime because she is working pursuant to an alternative workweek schedule is a type of exemption on which the employer bears the burden of proof. (See *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1327-1328.) That means it was QCH's burden to prove Myers was temporarily assigned to work as a caregiver on certain days on which she claimed she worked overtime. It fails to meet its burden. The *only* evidence it cites to support its argument is Myers' testimony that her title was "Administrator," and Singh's testimony that "[s]ometimes administrators work 12-hour shifts as a caregiver also," and, "if somebody works a 12-hour shift, it's as a caregiver."[5] This is insufficient to meet its burden, particularly in light of Myers'

---

[5] QCH cites page 31, lines three through 12 of the reporter's transcript, where Myers testified QCH ran five residential care facilities, and her title was administrator. It may have meant to cite page 32, where Myers testified she "was a caregiver from time to time."

testimony that she cannot be certain whether she was working as a caregiver on those days she reported working from 7:00 a.m. to 7:00 p.m.  Indeed, QCH comes close to acknowledging it failed to meet its burden when it states, "[t]here was no evidence presented at trial as to how many days [Myers] worked a Caregiver shift during her employment."  If there was no evidence presented at trial as to how many days Myers worked a caregiver shift, then QCH failed to meet its burden of proving Myers was temporarily assigned to work as a caregiver on certain days and thus not entitled to overtime for working a 12-hour caregiver shift.

IV

Attorney Fees

QCH argues the attorney fee award should be reduced for various reasons, and Myers argues we lack jurisdiction to consider the propriety of the fee award because QCH did not appeal it.  Myers is correct.

"The right to appeal is conferred by statute.  [Citation.]  Code of Civil Procedure section 904.1, subdivision (a) lists appealable judgments and orders.  These include 'an order made after a judgment made appealable by paragraph (1).'  (Code Civ. Proc., § 904.1, subd. (a)(2) (section 904.1(a)(2).)  Under section 904.1(a)(2), postjudgment orders granting or denying motions for attorney fees are deemed to be appealable." (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1014-1015.)  " 'When a party wishes to challenge both a final judgment *and* a postjudgment costs/attorney fee order, the normal procedure is to file *two separate appeals*:  one from the final judgment, and a second from the postjudgment order.' "  (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222.)  "A postjudgment order which awards or denies costs or attorney's fees is separately appealable[ ] [citations] and if no appeal is taken from such an order, the appellate court has no jurisdiction to review it."  (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46.)  And again:  " 'An appellate court has no jurisdiction to review an award of attorney fees made after entry of

13

the judgment, unless the order is separately appealed.' [Citation.] ' "[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal." ' " (*Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171.)

A different situation arises "when a judgment awards . . . fees to a prevailing party and provides for the later determination of the amounts," in which case the appellate court may consider a challenge to the fee award on an appeal from the judgment. (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998.) In *Grant v. List & Lathrop*, for example, a judgment was entered awarding attorney fees to certain parties, with the amount "left blank for future determination." (*Id*. at p. 996.) Four months after the judgment was entered, the trial court entered an order setting the amount of fees. The appellants appealed from the judgment, but did not separately appeal from the order setting the amount of fees. (*Ibid*.) In this circumstance, the appellate court held, "the timely notice of appeal from the judgment subsumed [the] subsequent order fixing the amount of attorneys fees awarded in the judgment." (*Id*. at p. 995; see also *R. P. Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146, 158 ["when the judgment awards attorney fees but does not determine the amount, the judgment is deemed to subsume the postjudgment order determining the amount awarded, and an appeal from the judgment encompasses the postjudgment order"].)

Here, judgment was entered on May 6, 2024, and the judgment did not mention attorney fees. Indeed, Myers did not file a motion for attorney fees until May 13, 2024, or over a week after the judgment was entered. On July 11, 2024, the trial court entered an order granting Myers' motion for attorney fees and awarding her $78,715.

QCH filed only one notice of appeal. The notice was filed on July 12, 2024, and it identifies only the May 6, 2024, judgment after court trial, and does not mention the subsequent order awarding attorney fees. QCH also checked the optional box stating,

14

"[t]he judgment or order being appealed is attached," and the only document it attached to the notice of appeal is the May judgment, which makes no mention of attorney fees. We thus agree with Myers that the postjudgment order awarding attorney fees is not before us. Moreover, because the judgment does not award fees and leaves the amount blank for later determination, this case does not fall within the rule announced in *Grant v. List & Lathrop, supra*, 2 Cal.App.4th at page 998, that "when a judgment awards . . . fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." We thus have "no jurisdiction" to review the amount of the fee award. (*Norman I. Krug Real Estate Investments, Inc. v. Praszker, supra*, 220 Cal.App.3d at p. 46.)

QCH nonetheless urges us to review the award. It notes Myers sought fees pursuant to Labor Code section 1194 (among other code sections), which provides, "any employee receiving less than the . . . legal overtime compensation applicable to the employee *is entitled to recover* in a civil action the unpaid balance of the full amount of this . . . overtime compensation, including interest thereon, *reasonable attorney's fees*, and costs of suit." (Italics added.) It then argues that, because the trial court entered judgment awarding Myers' unpaid overtime compensation, attorney fees were mandatory and were thus "effectively an integral part of the judgment" even though the judgment did not mention them. It cites no legal authority to support its argument, and we are aware of none.

QCH also cites the rule that a "notice of appeal must be liberally construed." (Cal. Rules of Court, rule 8.100(a)(2).) This is true, but no amount of liberal construction would allow us to construe this notice of appeal as including the postjudgment order awarding attorney fees, particularly where, as here, the notice states the judgment or order appealed from is attached, and the only document attached is the May 6 judgment, that makes no mention of fees.

15

## DISPOSITION

The judgment is affirmed.  Myers shall recover her costs on appeal.  (Cal. Rules of
Court, rule 8.278(a)(1), (2).)


_____/s/_____
EARL, P. J.


We concur:


_____/s/_____
ROBIE, J.


_____/s/_____
WISEMAN, J.*

---

\*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.